NILS ROSENQUEST [SB# 87661]
ROSENQUEST & ASSOCIATES
2720 Taylor Street, Suite 420
San Francisco, California  94133
Telephone:  415-292-0980
Facsimile:   415-292-0989
Email: rosenquest@earthlink.net

MICHAEL S. DEVORKIN
JACQUELINE G. VEIT
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
Telephone: 212-907-7300
Facsimile:   212-754-0330
Email: mdevorkin@golenbock.com
Email: jveit@golenbock.com

Attorneys for the Plaintiff,
Gerard A. McHale, Jr., P.A., Liquidation Trustee

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA — SAN FRANCISCO DIVISION

| | |
|---|---|
| GERARD A. MCHALE, Jr., P.A., as Liquidation Trustee for the 1031 Debtors Liquidation Trust,<br><br>            Plaintiff,<br><br>     v.<br><br>SILICON VALLEY LAW GROUP, a professional corporation,<br><br>            Defendant. | Case No. CV 10-04864-JCS |

**TRUSTEE'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO SVLG'S RENEWED MOTION FOR PARTIAL SUMMARY
JUDGMENT WITH RESPECT TO DAMAGES**

1668716.6

## <u>TABLE OF CONTENTS</u>

Table of Authorities ....................................................................................................... ii

SUMMARY OF ARGUMENT ...........................................................................................1

STATEMENT OF FACTS ...................................................................................................2

A.  1031 Advance Owned the Exchange Funds and Had Lawful Possession .......................2

B.  The Trustee's Proof Of Damages ..................................................................................5

ARGUMENT .......................................................................................................................7

THE PROPER MEASURE OF THE DAMAGE TO 1031 ADAVANCE
IS THE AMOUNT OF THE ASSETS TRANSFERRED FROM ITS
ACCOUNTS ........................................................................................................................7

A.  The Proper Measurement For Damages Is the Measure
For Conversion .............................................................................................................8

B.  Damages Are Not Limited ..........................................................................................11

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Albemarle Paper Co. v. Moody*
  422 U.S. 405 (1975)..................................................................................................... 9

*Aloe Vera of Am., Inc. v. United States*
  699 F.3d 1153 (9th Cir. 2012) ..................................................................................... 8

*AT&T Corp. v. Walker*
  2006 U.S.Dist. LEXIS 64542 (W.D.Wash. Sept. 11, 2006)................................... 12

*Baena v. KPMG LLP*
  453 F.3d 1 (1st Cir. 2006)........................................................................................... 12

*Bankers Trust Co. v. Rhoades*
  859 F.2d 1096 (2d Cir. 1988)................................................................................ 8, 12

*O'Halloran v. First Union Nat'l Bank*
  350 F.3d 1197 (11th Cir. 2003) .................................................................................. 10

*Chase Inv. Serv., Corp. v. Law Offices of Jon Divens Assos., LLC*
  748 F.Supp.2d 1145 (C.D.Cal. 2010) ....................................................................... 10

*Donell, v. Nixon Peabody LLP*
  No. 12-04084 DDP (JEM), 2012 WL 3839402 (C.D. Cal. 2012) ......................... 13

*Express Media Group, LLC v. Express Corp.*
  No. 06-03504 WHA, 2007 WL 1394163 (N.D.Cal. May 10, 2007) ..................... 10

*FDIC v. O'Melveny & Myers*
  969 F.2d 744 (9th Cir. 1992), *rev'd on other grounds,* 512 U.S. 79 (1994)
  *on remand*, 61 F.3d 17 (9th Cir. 1995) ................................................................... 14

*Felder v. United States*
  543 F.2d 657 (9th Cir. 1976) ....................................................................................... 9

*Fisher v. Apostolou*
  155 F.3d 876 (7th Cir. 1998) ................................................................................. 8, 12

*Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exch. Servs.*
  2009 Bankr. LEXIS 4133 (Bankr. E.D.Va. May 7, 2009)....................................... 3

*Hunter v. Citibank, N.A.*
  No. 09-02079 JW, 2010 WL 2509933 (N.D. Cal. Feb. 3, 2010).................... 14, 15

*In re 1031 Tax Group, LLC*
    439 B.R. 47 (Bankr. S.D.N.Y. 2010) .................................................................................. 3, 9

*In re CNB Intern., Inc.*
    393 B.R. 306 (W.D.N.Y. 2008) ............................................................................................... 11

*In re E.S. Bankest, L.C.*
    No. 04-17602-BHC-AJC, 2010 WL 1417732 (Bkr. S.D.Fla. April 6, 2010) ...................... 11

*In re Flagship Healthcare, Inc.*
    269 B.R. 721 (S.D.Fla. 2001) .................................................................................................. 11

*In re Senior Cottages of America, LLC*
    482 F.3d 997 (8th Cir. 2007) .................................................................................................. 11

*In re Seven Seas Petroleum*
    522 F.3d 575 (5th Cir. 2008) .................................................................................................. 11

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*
    8 F.3d 130 (2d Cir. 1993) ........................................................................................................ 13

*Koch Refining v. Farmers Union Cent. Exch., Inc.*
    831 F.2d 1339 (7th Cir. 1987) .................................................................................................. 9

*Loyd v. Paine Webber, Inc.*
    208 F.3d 755 (9th Cir. 2000) .................................................................................................. 12

*McHale v. Citibank, N.A.*
    420 B.R. 178 (Bankr. S.D.N.Y. 2009) .................................................................................. 15

*Official Comm. of Unsecured Creditors v. R. F. Lafferty & Co.*
    267 F.3d 340 (3d Cir. 2001) .................................................................................................... 13

*Pareto v. F.D.I.C.*
    139 F.3d 696 (9th Cir. 1998) .................................................................................................. 12

*Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co.*
    219 F.3d 895 (9th Cir. 2000) .................................................................................................. 13

*Renfroe v. United States*
    No. 04-1955 GHK, 2005 WL 5887178 (C.D.Cal. July 6, 2005) ........................................... 9

*SEC v. King Chuen Tang*
    No. 09-05146 JSC, 2012 WL 10522 (N.D. Cal. Jan. 3, 2012) ............................................... 8

*Shearson Lehman Hutton, Inc. v. Wagoner*
    944 F.2 114 (2d Cir. 1991) ...................................................................................................... 14

*Smith v. Arthur Anderson LLP*
    421 F.3d 989 (9th Cir. 2005) .......................................................................................... 12, 15

iii

*Terry v. SunTrust Banks, Inc.*
   Nos. 11-1704, 11-1707, 2012 WL 2511066 (4th Cir. July 2, 2012) ........................................ 3
   *aff'g*, No.09- 2054-JFA-S, 2011 WL 2444805 (D.S.C. June 15, 2011) ............................ 3

*Thabault v. Chait*
   541 F.3d 512 (3rd Cir. 2008) ........................................................................................ 12, 13

**CALIFORNIA CASES**

*DiPalma v. Seldman*
   27 Cal. App.4th 1499 (Cal. App. 2d Dist. 1994) ................................................................. 9

*Grafton Partners v. Pricewaterhousecoopers*
   No. 2002-056106, 2006 WL 4555171 (Cal. Sup. March 21, 2006) ................................... 13

*Hartford Financial Corp. v. Burns*
   96 Cal.App.3d 591 (App. 2d Dist. 1979) ......................................................................... 10

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*
   133 Cal.App.4th 658 (Cal. App. 1st Dist. 2005) ............................................................... 13

*Turpin v. Sortini*
   31 Cal.3d 220 (Cal. 1982) ................................................................................................. 9

*Viner v. Sweet*
   30 Cal.4th 1232 (Cal. 2003) ............................................................................................ 10

**FEDERAL STATUTES**

11 U.S.C. § 541 ........................................................................................................................ 9

26 U.S.C. § 1031 ...................................................................................................................... 4

**CALIFORNIA STATUTES**

Cal.Civ.Code § 3333 ................................................................................................................ 9

Cal.Civ.Code § 3336 .............................................................................................................. 10

**OTHER AUTHORITIES**

26 C.F.R. § 1.103(vi)-1g(4)(i)-(vii) ........................................................................................ 4

Dobbs, *Law of Remedies* § 3.3(7), at 231-32 (2d ed.1993) ................................................. 12

Fed.R.Civ.P. 9(a) ................................................................................................................... 10

Fed.R.Civ.P. 17(a)(1) ............................................................................................................. 10

iv

SUMMARY OF ARGUMENT

The Trustee, successor in interest to 1031 Advance, contends that SVLG's conduct caused 1031 Advance and its exchange funds to be put in harm's way, where they could be converted by others.[1]  The measure of damages for causing a conversion of property applies here.  The Trustee seeks to recover on 1031 Advance's malpractice claim for its own direct injury, to wit, the value of 1031 Advance's funds taken, and not on any separate breach of trust claims by a select group of exchangers or for indirect injuries exchangers suffered when 1031 Advance could not meet its contractual obligations (however similar the amount may be).

In 2011, SVLG moved for partial summary judgment.  Dkt. 52-1, TE Exh. 1.[2]  SVLG claimed that although funds deposited by clients with 1031 Advance and misappropriated by Okun "were in the possession of 1031 Advance, they represent injuries to the individual investors and not to 1031 Advance itself, giving the trustee no standing to seek damages which would include the funds."  2011 WL 6990187 *8 (Dkt. 76, SVLG Exh. O).  Judge Ware denied the motion, holding that the Trustee has standing to assert a claim for malpractice, because the cases "establish that the dissipation of a *corporation's* assets confers standing upon a corporation" (emph. added); and stating that the cases cited by each side did not adequately address "the proper measure of damages to a corporation when funds deposited by clients are misappropriated."  He denied the motion, with leave to refile a new motion "on the issue of the appropriate measure of damages to 1031 Advance."  *Id.*

---

[1]  This is set forth in detail in the Trustee's opposition to SVLG's Motion in Limine No. 2 to which we respectfully refer the Court.

[2]  The Trustee opposed the motion.  Dkt. 68.  TE Exh. 2.  The Trustee's exhibits are referred to herein as "TE Exh. __" and are attached to the Declaration of Michael S. Devorkin submitted herewith.  The deposition testimony referred to herein is also set forth in or attached to the Devorkin Declaration. SVLG's Exhibits attached to the Sturmer Declaration are alphabetical and are referred to as "SVLG Exh. __."

SVLG's motion does not cite a single new case, does not address the measure of damages, and is not the motion Judge Ware permitted.  While SVLG asserts numerous times that the Trustee is barred because he seeks recovery of the "client's funds" or a "particularized injury to the creditors," no matter how many times SVLG distorts the record by repeating these phrases, they are still inaccurate.  As its own witnesses agreed, and the Joint Statement of Material Facts shows, the funds belonged to 1031 Advance and the taking caused it damage in that amount.  While the taking of 1031 Advance's funds from its bank accounts may have prevented it from meeting its contractual obligations to its clients, thus indirectly damaged them, it does not follow that the Trustee is pursuing the client's claims rather than 1031 Advance's own claims.

Since Judge Ware held that dissipation of these assets is 1031 Advance's claim, the threshold question (that he did not reach) is whether the assets belonged to 1031 Advance. SVLG ignores, as its officers and expert admit, that once the clients deposited the funds, 1031 Advance owned the funds and had lawful possession.  When the funds were taken later, the client was merely an unsecured creditor, with contractual rights, but not the right of ownership. A party owning or lawfully holding property that is wrongly converted has been injured by the value of that property and has a right to recover that amount in damages.  When cash is stolen, the answer is simple and obvious: the measure of damages is the amount of the cash.

## STATEMENT OF FACTS

### A.     1031 Advance Owned the Exchange Funds and Had Lawful Possession.

The stock purchase agreement to sell 1031 Advance provided that 1031 Advance had title to all of its assets free and clear of all liens; schedule 4.20 listed the *company's* bank accounts with exchange funds as assets.  TE Exh. 3, §§ 4.09, 4.20, and Sched. 4.20; TE Exh. 4, pp. 62-68, 71-73.  At the time of sale, 1031 Advance had $23 million of exchange funds in off-

1668716.6

balance sheet assets, and the enterprise value of its business was at least $23 million.  TE Exh. 5, pp. 82-83, 87, 95-97; TE Exh. 6, pp. 9-10; TE Exh. 4, pp. 47-50, 98-99, 118-19.  SVLG concedes much of this in the Joint Statement of Material Facts Not in Dispute ("Jt. Stmt.") ¶¶ 8, 9, 10, 12, 14, 19.

*As all of SVLG's witnesses testified*, but SVLG totally ignores, that under 1031 Advance's exchange agreements, when it received the deposits, the funds "belonged to" 1031 Advance, and the clients had no interest in the funds.  Brody, TE Exh. 7, pp. 129; Chapman, TE Exh.8, pp.27-28;[3] Burr, TE Exh.5, pp. 81-82 (funds are the principal asset of company), 84-87. *See* Jt. Stmt. ¶¶ 8, 9, 10, 12, 14, 19.  The law is the same.  *See, e.g., Terry v. SunTrust Banks, Inc.*, Nos. 11-1704, 11-1707, 2012 WL 2511066, *2 (4th Cir. July 2, 2012), *aff'g*, No.09- 2054-JFA-S, 2011 WL 2444805, *4-5 (D.S.C. June 15, 2011); *Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exch. Servs.,* 2009 Bankr. LEXIS 4133 (Bankr. E.D.Va. May 7, 2009).  In the bankruptcy of the 1031 Tax Group debtors, the Court made this very holding.  *In re 1031 Tax Group, LLC,* 439 B.R. 47, 52, 70-71 (Bankr. S.D.N.Y. 2010).[4]  The sole relationship between 1031 Advance and the exchangers was one of contract debtor and creditor.  1031 Advance, even if insolvent and in bankruptcy) may pursue a wrongdoer, and the clients are only unsecured creditors of the company. TE Exh. 7, pp. 129-34; TE Exh. 8, pp. 30-31.[5]

---

[3] SVLG's attempt to distance itself from the binding statements of its own witnesses, SVLG Mem. 10-11, is frivolous. First, each was unequivocal. Second, Brody was the CEO of SVLG, not just a 30(b)(6) witness, and so his evidence is binding for multiple reasons. Third, in Brody's 30(b)(6) capacity, his knowledge about practices and procedures on due diligence in real estate transactions certainly required him to know how to protect and advise his client in a 1031 transaction with a qualified intermediary, and - to do so and advise about security and alternative measures like escrow or trust - he needed to know who would own the funds once they were in the QI's bank account.  He also had extensive experience advising clients about 1031 transactions. TE Exh. 7, pp. 9-11, 30-38, 71-73, 118-42, 151-60.

[4] For a summary of obligations and ownership of funds by a typical Qualified Intermediary, see *Terry v. SunTrust Banks, Inc., supra*.  As explained there, 1031 Advance was to use the funds to acquire the replacement property and transfer it to the client. 26 C.F.R. § 1.1031(k)-1(g)(4)(iii)(B).

[5] Originally, a few 1031 Advance exchangers brought a class action against SVLG alleging a trust and that SVLG aided and abetted a breach of a fiduciary duty owed by 1031 Advance and/or Okun to the exchangers.  No. 5:09-cv-02079.  SVLG argued against those claims, in part by asserting that 1031

Ignoring its own witnesses and the Joint Statement on the issue of ownership, SVLG repeatedly claims that the Trustee is seeking "loss of its clients Exchange funds," "loss of client Exchange funds," "the Exchanger Client's funds," or "client (sic) exchanger funds."  SVLG Mem. pp. 1-4.  SVLG's citations to the complaint and discovery responses do not support SVLG but show the contrary.  The complaint (SVLG Exh. K) does not say 1031 Advance "temporarily held Exchanger Client's funds," or use the term "exchanger client funds" (¶¶19, 25).  Interrog. Answer 6 (SVLG Exh. C) does not use the term client exchanger funds.  The complaint says that under Section 1031 of the Internal Revenue Code, an exchanger may not take actual or constructive possession of the funds, Exh. K, ¶¶16-18; *see* 26 C.F.R. §1.103(vi)-1g(4)(i)-(vii) and it consistently refers to the funds as "Exchange Funds," not Exchanger or Exchanger's or Client's funds, ¶¶20, 21. 43, 46. 48, 55. 57, 67, 74.  In fact, the complaint typically refers to the "misappropriation of funds belonging to the 1031 Debtors," "Exchange Funds of the 1031 Debtors," or "1031 Advance Exchange Funds."  See SVLG Exh. K, ¶¶24, 28, 59, 64, 75, 81, 89, 122; SVLG Exh. C, No. 6 ("1031 Advance Exchange Funds taken from 1031 Advance; "deficit in the funds of 1031 Advance").  *See* Jt. Stmt. ¶¶ 8, 9, 10, 12, 14, 19.

Thus, SVLG does not cite any *evidence* to support its claim that exchangers owned the funds.  Further, SVLG has affirmatively stated that 1031 Advance did not hold exchange funds in trust for its exchange clients.   Jt. Stmt. ¶11; TE Exh. 11, No. 56, 57.  If it did not hold the funds in trust, it could only have held them as its own funds.

---

Advance did not hold exchange funds in trust.  Dkt. 447, p. 1, TE Exh. 9.  After Judge Ware denied class certification, Dkt. 566, a select group of individual exchangers filed a separate action, 11-cv-04825, Dkt.1, SVLG Exh. M.  That new case was stayed, Dkt. 34, SVLG Exh. L.

The exchangers have effectively withdrawn their claims for breach of fiduciary duty in favor of the Trustee's recovery of the money taken from 1031 Advance's accounts.  On July 31, 2012, SVLG and the exchangers in the new case filed a joint status statement agreeing that the case by individual exchangers would be dismissed at the conclusion of this Trustee case, unless the Court dismissed the Trustee's case or reduced the Trustee's damages on grounds (i) of lack of standing, (ii) of unclean hands or *in pari delicto*, or (iii) that the exchangers not the Trustee can recover damages.  Dkt. 42.  TE Exh.

### B.     The Trustee's Proof Of Damages

Both sides' damage experts agree that the central purpose of calculating damages is to put the injured party in the same position that it would have occupied but for the wrongdoing. Trustee's expert, TE Exh. 6, pp. 8-12, TE Exh. 4 at 114-19; SVLG's expert, TE Exh. 5, pp. 50, 52.  1031 Advance's enterprise value at the time of the sale was $23.2 million.  Jt. Stmt. ¶10; TE Exh. 5 at 82-83, 87, 95-97.[6]  The Trustee's damage expert explained that the misappropriation of the cash from 1031 Advance would have reduced the business enterprise value of 1031 Advance by the cash taken and that would be the measure of damages and the amount to restore the company to its position prior to the loss.  TE Exh. 6, 10-11.

John Sordillo, the Trustee's forensic expert,[7] traced funds looted from 1031 Advance: (i) $23.2 million was taken on the December 2006, sale; and (ii) $11.7 million was taken between then and the May 2007 bankruptcy.  Jt. Stmt. ¶19; TE Exh. 12, pp. 14-18.  On the Petition Date, 1031 Advance had a deficit of $31.2 million needed to close its exchangers.[8]  TE Exh. 7; Jt. Stmt. ¶¶18, 20; TE Exh. 12, p. 16; TE Exh. 15, pp.221-25.[9]

***Economic Injuries.***  Since the purpose of awarding damages is to restore 1031 Advance to the position it was in before the loss, the amount taken must be replaced**.**  When a company's cash assets are taken, damages are the amount taken.  TE Exh. 5, pp. 85-86, 105-06,[10]  Put another way, when the money was taken, 1031 Advance had a hole in its bank account, but it

---

10.  On September 11, 2012, the parties dismissed the original exchanger case, 09-cv-02079, TE Exh. 19; Dkt. 615.

[6] Exchange deposits and liabilities exist but for accounting purposes are off the balance sheet.  TE Exh. 4, pp. 46-50, 88.  Once the asset is looted, upon bankruptcy the liabilities to exchangers of $31.2 million would be added to the balance sheet.  TE Exh. 4, pp. 92-93, 112-13.

[7] Sordillo testified to the facts as a forensic expert, but not to any theory of damages.  A summary of his findings is TE Exh. 12 (Exh. 6); TE Exh. 13; TE Exh. 14 (1031 Advance flow charts).

[8] The total missing for all debtors is about $148,000,000.  TE Exh. 13, p. 12.

[9] The $31.2 million figure is found in TE Ex. 16 at 1, an update that Sordillo prepared before testifying.

had the same liabilities, which it could not pay.  In order to restore 1031 Advance to its prior position, it must be made whole for (i) $34,914,585, the exchange funds taken from its accounts, or, in the alternative, $ 31.2 million, the shortage on the date of the bankruptcy petition, plus (ii) its share of more than $ 5 million of fees and costs to unravel the financial facts and trace assets.[11]  Jt. Stmt. ¶¶10, 18-20.

Economic damages to the company are defined as the change in the "business enterprise value," which means the value of equity plus liabilities.  TE Exh. 6, pp. 8-12; TE Exh. 4, pp. 114-19.  SVLG's expert agrees that the business enterprise value of 1031 Advance the moment before the sale was at least the $23 million referred to above, Jt. Stmt. ¶10, and that 1031 Advance would have to recover at least $30 million to restore it to the position it was in just before the sale.  TE Exh. 5, pp. 87, 90, 92-94; TE Exh. 6 at 7-15; Ex. 4 at 114-19.

As part of Okun's use of 1031 Advance to further the Ponzi scheme, 1031 Advance also used funds *from other subsequent exchangers* (clients of either 1031 Advance and other Okun QI's) to close the transactions of a select group of exchangers who had open exchanges at 1031 Advance on December 19, 2006 (the "December 19 Clients").  Jt. Stmt. ¶¶15, 16. [12]  This is the essential nature of a Ponzi scheme and it does not change the true economic loss to 1031 Advance.  When the $23.2 and the $11.7 million was taken, 1031 Advance remained liable to those existing exchangers for these amounts but it had no assets to match these liabilities.  It was now in the hole $34.9 million, and it needed to climb out of this hole to recover fully.  New clients unknowingly supplied money to meet some of the liabilities to the December 19 Clients.

---

[10] The economic loss is the same as the loss to a bank if depositor funds are taken.  TE Exh. 4, pp. 97-98.

[11] TE Exh. 12, pp. 3-6; Ex. 15 at 196-99, 225-27, 229; TE Exh. 17, pp. 23, 99, 109; TE Exh. 15, pp. 89-90, 197-98; TE Exh. 12, pp. 7-21; TE Exh. 18 (Exh. 6), 13.

[12]  As part of the trial preparation process to narrow issues for the jury, the parties have executed a stipulation as to a number of items, including agreement that issues relating to monies collected from other settlements or collateral sources will be addressed by the Court after a jury verdict.

1668716.6

However, when 1031 Advance used these funds from subsequent exchangers of 1031 Advance or other QI's, 1031 Advance still had had liability to those exchangers or QI's to repay those "new" funds.[13]  This was not free money.  1031 Advance's actual liabilities and the $34.9 million hole remained the same and so did its actual damages.  *The entity was just as bad off as when it started*.  TE Exh. 6, pp. 9-11.

That is why, as of the petition, 1031 Advance still owed $31.2 million, Jt. Stmt. ¶¶18, 20, and why the jury should focus on the harm to the entity and not a small group of fortunate creditors, who received these lulling payments. When SVLG caused the initial harm of $23.1 million, and subsequent harm of $11.7 million, it is not entitled to a windfall credit because someone perpetuated the Ponzi scheme by taking money from subsequent exchangers to close the transactions of the December 19 Clients.  If a robber steals $1 million from Bank 1, and then Bank 1 borrows $500,000 from Bank 2 (which Bank 1 must repay), it does not reduce Bank 1's claim against the robber.  Had 1031 Advance borrowed $34.9 million from a bank to temporarily fill the hole and pay December 19 Clients; it would still be damaged by the $34.9 million needed to repay the bank.

## ARGUMENT

### THE PROPER MEASURE OF THE DAMAGE TO 1031 ADVANCE IS THE AMOUNT OF THE ASSETS TRANSFERRED FROM ITS ACCOUNTS.

It is hard to determine what SVLG is actually arguing concerning the measurement of damages, because it does not cite any measurement cases.  The first time around, it argued that the Trustee did not have standing based on the loss of exchange funds, and now it recycles this argument, seeking to prevent the Trustee from recovering the amount taken from 1031

---

[13] These subsequent exchangers were defrauded.  They were never told there were insufficient funds at 1031 Advance and the other Okun QIs to meet *all of the obligations outstanding* and that their funds were being used to pay earlier exchangers, leaving insufficient funds to pay the later exchangers.

1668716.6

Advance on the grounds that only the creditors can recover this amount (even though they have no malpractice claim against SVLG).[14]

SVLG conflates the Trustee's claim and damages with the exchanger's separate and much more difficult claim. It treats the terms "claim" and "loss" as the same. A claim's elements are duty, breach, and an injury, not merely loss. The Trustee's malpractice claim is for breach of duties owed *to the entity and the monies take from it as a result.* A creditor claim is for breach of fiduciary duty arising from a trust owed to the exchangers; it is distinct and independent, even if the creditors are indirectly damaged when the entity's funds are taken. That damages are similar does not mean that the entity cannot pursue its own claim.

1031 Advance's loss is the amount taken from it, and this is the amount needed to restore it. That creditors of 1031 Advance are indirectly injured in a similar amount, because 1031 Advance cannot meet its contractual obligations, does not diminish 1031 Advance's losses.[15] The amount taken from 1031 Advance is the only proper measure of damage.

### A. The Proper Measurement For Damages Is the Measure For Conversion.

In opposing this belated motion for summary judgment, the evidence must be viewed in the light most favorable to the Trustee, and "all reasonable factual inferences in favor of the non-movant." *SEC v. King Chuen Tang,* No. 09-05146 JSC, 2012 WL 10522, *22 (N.D. Cal. Jan. 3, 2012) (Spero, J.); *Aloe Vera of Am., Inc. v. United States,* 699 F.3d 1153, 1165 (9th Cir.

---

[14]  SVLG is determined to deny recovery to both the Trustee and the exchangers. In the exchangers' suit, where exchangers would have to succeed by proving a trust and that SVLG knowingly aided and abetted a breach of fiduciary duty, SVLG denied the trust and the duty.

[15] Neither the Trustee nor the exchangers have ever contended that SVLG pay duplicative damages. Indeed, the exchangers have withdrawn in favor of the Trustee. *See supra* at n. 6. The issue is moot, but, if and when it ever arises, it should be dealt in terms of satisfaction of judgment or otherwise. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir. 1988), held that the best way to avoid duplicative recoveries is to see what the Trustee recovers and then allow the creditor to recover the balance, if it can do so on its own theory. *Fisher v. Apostolou,* 155 F.3d 876 (7th Cir. 1998) (stayed the creditors in favor of the entity).

2012) ("assume the version of the material facts asserted by non-moving party to be correct"). As we have shown, there is no serious dispute that exchange funds in 1031 Advance's bank accounts belonged to 1031 Advance.  At a minimum, 1031 Advance had lawful possession of the funds.[16]  Pursuant to 11 U.S.C. §541, the 1031 Advance estate included "all legal or equitable interests of the debtor in property as of the commencement of the case," including any action by the debtor "to recover . . . for fiduciary misconduct, mismanagement, or neglect of duty. . . ." 11 U.S.C. §541; *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343-4 (7th Cir. 1987).  Money in a bank account in the name of a debtor is presumed to be property of the estate.  *In re 1031 Tax Group, LLC,* 439 B.R. 47, 70 (Bankr. S.D.N.Y 2010) (and cases cited).

It is also clear that once the funds were taken, the same amount was needed to restore 1031 Advance to its prior position.  Restoration is the touchstone.  *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418-19 (1975); *Felder v. United States,* 543 F.2d 657, 667 (9th Cir. 1976); *Turpin v. Sortini,* 31 Cal.3d 220, 232 (Cal. 1982).  A plaintiff is entitled to compensation "for all of the detriment proximately caused [by the defendant's negligence], whether it could have been anticipated or not." *Renfroe v. United States*, No. 04-1955 GHK, 2005 WL 5887178 *7 (C.D.Cal. July 6, 2005) (quoting Cal.Civ.Code §3333).  In a malpractice action, an attorney is liable "for all damages directly and proximately caused by his negligence."  *DiPalma v. Seldman,* 27 Cal. App.4th 1499, 1507 (Cal. App. 2d Dist. 1994).

Conversion damages are based on the concept of restoring the injured party.  First, the Trustee's claim is that SVLG's malpractice put 1031 Advance and its funds in unsafe hands

---

[16] SVLG's current motion does not contest ownership, but if it did, on its motion, at minimum the evidence creates issues of fact.

1668716.6

that *converted* the funds.[17]   A claim for conversion is valid if a party either owns property or has lawful possession.[18]   *Hartford Financial Corp. v. Burns,* 96 Cal.App.3d 591, 598 (App. 2d Dist. 1979); *Express Media Group, LLC v. Express Corp.,* No. 06-03504 WHA, 2007 WL 1394163, *3 (N.D.Cal. May 10, 2007).   Second, the measure of damages is the value of the property at the time of conversion.   Cal.Civ.Code §3336; *Hartford,* 96 Cal.App.3d at 605-06 (lienholder still gets the full value, even though lien was lower); *Chase Inv. Serv., Corp. v. Law Offices of Jon Divens Assos., LLC,* 748 F.Supp.2d 1145, 1181 (C.D.Cal. 2010).

Where cash is taken, value is easy, even if the entity is insolvent.  Take an extreme case: An insolvent company is operating as a debtor in bankruptcy, and an alarm company installs a faulty alarm, which puts the company's safe in harm's way of a thief, who then takes the cash. First, in order to restore the company to its prior position, it would be entitled to recover the full amount from the negligent alarm firm that put the safe in harm's way.  This would be true even for a company (unlike 1031 Advance) that first obtained the money by operating a Ponzi scheme.  *C.f. O'Halloran v. First Union Nat'l Bank,* 350 F.3d 1197, 1204 (11th Cir. 2003). Second, if 1031 Advance had borrowed money from a bank or investor to buy a building, but the money was in the safe and taken before it could make the purchase, 1031 Advance still would be entitled to the full amount lost.  Finally, if the company used the borrowed money to buy the building, but the alarm did not detect a prowler who caused a fire, the company would be entitled to recover the full value of the damaged building, even though it must eventually

---

[17] SVLG recites that Okun caused the taking of the funds.  SVLG Mem. 5.  The complaint does not allege, and the Trustee does not have to prove, that SVLG was the *exclusive* cause, but merely a substantial factor in causing the harm.  *See Viner v. Sweet,* 30 Cal.4th 1232, 1239-40 (Cal. 2003); Judicial Counsel of Cal.Civ. Jury Instns. (2006) Nos. 430, 431.

[18] The Trustee may recover damages even if 1031 Advance merely had lawful possession of the funds. As a precaution, in September 2011, the Trustee moved to amend to add a bailee claim, which Judge Ware denied.  2011 WL 6990187 *8.  Under Fed.R.Civ.P. 9(a) and 17(a)(1), however, the Trustee need not plead any alternative interest in the funds and the motion was unnecessary.  The Trustee is entitled to also proceed on a lawful possession theory.  In any event, the measurement of damages is the same.

repay the investor/lender.  The fact that an investor/lender is indirectly damaged by an amount similar to the company's loss does not alter the company's damages or recovery.

### B.   Damages Are Not Limited.

Dissipation of a company's assets reduces the value of its assets, sometimes to the point of insolvency.  The company has less money to pay creditors and is directly injured by that amount.  The creditors are only injured indirectly, and the amount of their injury is wholly dependent on the lower value of the entity's assets.  *In re Senior Cottages of America, LLC*, 482 F.3d 997, 1006 (8th Cir. 2007) (citing *Smith v. Arthur Anderson LLP*, 421 F.3d 989, 1004 (9th Cir. 2005)).  If the indirect injury to creditors deprived a debtor of damages or transformed a debtor's claim into a claim owned by creditors, every suit by debtors would be worthless, since all trustees are collecting for later distribution to creditors.[19]  *Id.* at 1006 (citing *Official Comm. of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340, 346 (3d Cir. 2001)).  Although *Senior Cottages* is a pleading decision, the Court still held that the Trustee's damages would be the value of assets taken from the company.  *Id.* at 1005; a*ccord, In re E.S. Bankest, L.C.*, No. 04-17602-BHC-AJC, 2010 WL 1417732 (Bkr. S.D.Fla. April 6, 2010) (damages of $170 million for looting that increased insolvency); *In re CNB Intern., Inc.*, 393 B.R. 306 (W.D.N.Y. 2008); *In re Flagship Healthcare, Inc.,* 269 B.R. 721, 728 (S.D.Fla. 2001) (additional debt).

The cases cited above were not cited to Judge Ware.  The pleading decisions below were cited and he stated that they did not expressly address the measure of damages. Yet each

---

[19] It is "possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct … and there is nothing illogical or contradictory about saying that [the third party] might have inflicted direct injuries on both" and creates two sets of claims.  *In re Seven Seas Petroleum,* 522 F.3d 575, 585-87 (5th Cir. 2008).

still is instructive.[20]  Generally, these cases hold that an entity has standing to pursue a claim where the injury is dissipation of its assets or an increase to its liabilities.  The tort principles set forth above require restoration to the prior condition in order to be made fully whole.  Thus, if harm gives rise to standing, it logically follows that the entity should recover the full amount of the dissipation to be made whole.  In *Loyd v. Paine Webber, Inc.*, 208 F.3d 755, 758 (9th Cir. 2000), a sham, insolvent company's injury was the looting of its funds; the only way to make it whole would be to award damages for the amount of funds taken.   In *Smith v. Arthur Anderson LLP,* 421 F.3d 989 (9th Cir. 2005), malpractice caused an insolvent company to incur debts it could not repay; this was the injury to the firm, and the trustee was entitled to "pursue a claim seeking *to rectify such injury*."  *Id.* at 1002-3 (emph. added); *accord, Bankers Trust Co.*, 859 F.2d 1096 at 1101 (although creditors gave funds to the debtor that it misused, estate could proceed *to recover the harm to the asset*, notwithstanding the creditors' claims) (emph. added);[21]  s*ee Thabault v. Chait,* 541 F.3d 512, 523 (3rd Cir. 2008); *Baena v. KPMG LLP*, 453 F.3d 1, 5 (1st Cir. 2006); *Fisher,* 155 F.3d at 878.

SVLG does not cite a single new case, and it is still wrong.  "That the creditors will benefit if such a suit [by the trustee] is successful does not mean that their own claims against KPMG are at issue. . . .  There is no threat that such a creditor or any other plaintiff will be allowed to recover twice for the same loss.  *See* Dobbs, *Law of Remedies* § 3.3(7), at 231-32 (2d ed.1993)."  *Baena*, 453 F.3d at 5; *accord, AT&T Corp. v. Walker*, 2006 U.S.Dist. LEXIS 64542, *3 (W.D.Wash. Sept. 11, 2006); *cf. Pareto v. F.D.I.C.,* 139 F.3d 696, 699 (9th Cir.

---

[20] Judge Ware did not reach the issue of ownership and the standard of measuring the loss that flows from it.  While appellate authority has not frequently addressed the measure of damages after trial, the pleading decisions on standing that follow still support that this is the proper measure of damages.

[21] *See Fisher,*155 F. 3d at 883 (both the Trustee and the individuals could proceed on their respective claims for looting, but court stayed the individual claims pending the outcome on the Trustee's claims).

1998) (California law).  SVLG rehashes its prior arguments, mistakenly relies on four cases that Judge Ware did not find persuasive on the issue of measuring the company's damages.

First, *R. F. Lafferty & Co., supra,* holds that a claim for injury to the corporation is separate and can be pursued by the corporation, even if it brings money into the estate and the creditors are the *only* beneficiaries thereof.  *Id.* at 351.  Indeed, the same court later held, explaining *Lafferty*, that creditors' claims do not prevent the company from proceeding on its claims for that same injury.  *Thabault*, 541 F.3d at 520, 523*; see Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co.*, 219 F.3d 895 (9th Cir. 2000); *Kalb, Voorhis & Co. v. Am. Fin. Corp.,* 8 F.3d 130, 134 (2d Cir. 1993).

Second, *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP,* 133 Cal.App.4th 658 (Cal. App. 1st Dist. 2005), is merely a standing case that relies on *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir. 1991) a standing case  much criticized outside of the Second Circuit, which the Ninth Circuit does not follow.  *Donell, v. Nixon Peabody LLP,* No. 12-04084 DDP (JEM), 2012 WL 3839402, *5 (C.D. Cal. 2012) (citing *CarrAmerica Realty Corp. v. Nvidia Corp.,* 302 Fed. Appx. 514 (9th Cir. 2009) [unpub.]).  Most important, *Peregrine* is different than this case, because there the company furthered a Ponzi scheme to harm others, while here, SVLG has admitted 1031 Advance was innocent, and SVLG harmed 1031 Advance by putting it in the hands of a wrongdoer, who took its money. *See Grafton Partners v. Pricewaterhousecoopers,* No. 2002-056106, 2006 WL 4555171 (Cal. Sup. March 21, 2006) (distinguishing *Peregrine* and the looting phase of a Ponzi scheme from the gathering of assets phase*).*  While *Peregrine* says the complaint did not identify the company's losses apart from losses to the investors, and that such a factor *may be* relevant for a sham corporation, it did not rule on that basis; rather, it accepted as sufficient allegations that the company lost investments.  1031 Advance is not a sham. Finally, *Peregrine* ignored that the

13

Ninth Circuit holds that even a sham corporation can pursue its own damages. *FDIC v. O'Melveny & Myers,* 969 F.2d 744 (9ᵗʰ Cir. 1992), *rev'd on other grounds,* 512 U.S. 79 (1994), *on remand,* 61 F.3d 17 (9ᵗʰ Cir. 1995).

Third, as to Judge Ware's own decision in *Hunter v. Citibank, N.A.,* No. 09-02079 JW, 2010 WL 2509933 (N.D. Cal. Feb. 3, 2010) ("*Hunter I*"), Judge Ware did not rely on that for good reason, and neither should this Court. First, *Hunter* merely held that a bankruptcy court channeling injunction did not bar any direct claims the creditors had against Cordell. Second, the Trustee was not a party,[22] and the question here was not before Judge Ware, was not briefed, and certainly was not essential on Cordell's motion.[23]  *Hunter II* upheld *allegations* that (i) the QIs owed fiduciary duties to the exchanger plaintiffs as trust beneficiaries, (ii) there was a breach of that duty;[24] and (iii) that a corporation's claims for breach of a fiduciary duty owed to it did not bar a creditor's suit for assisting in the breach of a fiduciary duty the corporation owes to that creditor." *Id.* at 9.  We agree completely, but the converse is also true.[25] While *Hunter I* stated in *dicta,* pp. 11-12, that the Trustee could not bring a hypothetical action against Cordell to recover the loss of exchange funds, Judge Ware did not find this controlled

---

[22] This Court issued two other decision involving defendant Cordell in the *Hunter* case: (i) July 20, 2010, denying Cordell's motion for reconsideration, Dkt. 354 ("*Hunter II")*; and (ii) May 5, 2011, denying Cordell's motion to dismiss the third amended complaint, Dkt. 500 ("*Hunter III"*).

[23] A review of all the *Hunter* decisions shows that the only issues then before the Court that were necessary to decide were (i) whether the *Hunter* plaintiffs had a direct claim against Cordell (which could be answered without determining what claims the Trustee had and, (ii) if so, whether the channeling injunction barred it.  The reason for this is that if the *Hunter* plaintiffs had a direct claim against Cordell, it could not be derivative of any claim the Trustee had against Cordell, and it was unnecessary to decide what claims the Trustee could pursue.  Anything else was *dicta.*

[24] Since this was a pleading decision, the Court did not and could not make findings that there was a trust or that there was a breach.

[25] The Court observed that *Wagoner* bars a trustee from seeking to recover for a wrong committed by management of the corporation to which the Trustee succeeds, but (i) this was dicta unnecessary to the issue then at hand; (ii) *Wagoner* has been rejected by the Ninth Circuit, *see supra* at 4, and (iii) the Trustee is suing for harms done to 1031 Advance by virtue of its sale, whereas the wrongdoing occurred thereafter.

14

when he ruled on SVLG's first motion, because it is clear this was unnecessary *dicta*.[26]

Fourth, in *McHale v. Citibank, N.A.,* 420 B.R. 178, 194 (Bankr. S.D.N.Y. 2009) ("*Citibank"),* the Court dismissed a complaint with leave to replead,[27] but held that the Trustee had constitutional standing to recover for damages, and that it was "unnecessary at this stage of the case to parse with precision for what injury the Trustee may seek to recover" *Id.* at 195-196. To the extent the Court also then mentioned specific damages, this was pure *dicta. See Smith* , 421 F.3d.989, courts should not address specific damages further at pleading stage once constitutional standing is established). In *Citibank,* the parties did not brief the measure of damages or the case law before this Court, because the only issue was constitutional standing to pursue any damages. Further, the order was a non-appealable, the Trustee file an amended complaint, and the parties settled before the court decided a motion to dismiss that complaint.

Respectfully submitted,

Dated: December 19, 2012

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP

s/ Michael S. Devorkin
Michael S. Devorkin, Pro hac vice
Jacqueline G. Veit, Pro hac vice

Attorneys for Plaintiff Gerard A. McHale Jr., P.A. Liquidation Trustee for the 1031 Debtors Liquidation Trust

---

[26] *Hunter I* also quoted *Smith,* 421 F.3d 989, to the effect that the trustee can only pursue claims held by the debtor itself and not those for which the creditor has standing, a proposition the Trustee does not challenge, because  the quoted language of *Smith* is not unfavorable to the Trustee. Rather, the balance of *Smith* did address the issue here, and it held that a "dissipation of assets" constitutes harm to the company, which a trustee can recover, even if (i) the misappropriation also injured the creditors, and (ii) the creditors have their own claims. *Id.* at 1004. Further, "it is a recognition of the economic reality that any injury to an insolvent firm is necessarily felt by its creditors," but notwithstanding the injury to creditors, "it is 'axiomatic' that a trustee has authority to bring" such actions. *Id.* Proceeding further at this time to parse the damages is premature. Once standing exists for any damages, questions regarding the proper measure of damages should be addressed by the trial court when defendants are held liable on the Trustee's claims. *Id.* at 1005.

[27] The Trustee filed a complaint, and Citibank moved to dismiss on grounds unrelated to constitutional standing or damages. At oral argument, the Court raised constitutional standing *sua sponte,* and Citibank and the Trustee then submitted supplemental briefs on standing. Citibank then argued the Trustee could not bring claims on behalf of creditors. The Trustee maintained that the Trustee was not doing so, but was bringing its own claim. The Trustee did not brief why it owned the claim or the scope of damages, since there was clearly standing for some damages. Devorkin Decl.¶ 22.

15
