UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALD A. MCHALE, Jr., P.A., as Liquidation Trustee for 1031 Debtors Liquidation Trust,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>SILICON VALLEY LAW GROUP, a California Law Corporation,<br><br>　　　　Defendant. | Case No.: 3:10-cv-04864-JCS<br><br>**ORDER DENYING DEFENDANT SILICON VALLEY LAW GROUP'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. No. 98].** |

## I.　INTRODUCTION

Plaintiff Gerald A. McHale, Jr., P.A., Liquidation Trustee for 1031 Debtors Liquidation Trust ("Trustee" or "Plaintiff"), brings this legal malpractice action against Defendant Silicon Valley Law Group ("SVLG" or "Defendant"). The Trustee asserts SVLG was negligent in conducting due diligence in connection with the sale of 1031 Advance to Edward Okun, who ultimately looted 1031 Advance of its assets. Before the Court is SVLG's Motion for Partial Summary Judgment as to the Measure of Damages which Plaintiff may request at the upcoming trial ("Motion"). In the Motion, SVLG argues that Plaintiff may not recover the amount of Exchange Funds which were stolen from 1031 Advance because the Exchange Funds represent a particularized injury to 1031 Advance's clients, and not an injury to 1031 Advance itself. The Motion came on for hearing January 25, 2013, at 9:30a.m. For the reasons stated below, the Motion is DENIED.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Undisputed Facts

This action arises in the aftermath of a Ponzi scheme orchestrated by Edward Okun ("Okun"). Okun has been convicted of stealing hundreds of millions of dollars from the 1031 Debtors--the bankrupt estates formally under Okun's control--and is currently serving a 100-year federal prison sentence for his crimes. Plaintiff is the Trustee for the 1031 Debtors, and brings this action on behalf of 1031 Advance, one of the 1031 Debtors. Defendant Silicon Valley Law Group represented 1031 Advance prior to Okun's purchase of the company.

1031 Advance, like all the 1031 Debtors, was in the business of conducting section 1031 exchanges. Section 1031 of the Internal Revenue Code permits owners of investment property to defer the capital gains tax that would otherwise be due and owing upon sale, conditioned upon timely application of the sale proceeds to the purchase of an identified replacement investment property. Joint Statement of Undisputed Facts ("JSUF") ¶ 1. In a typical section 1031 exchange, an exchanger sells a piece of real estate, has forty-five days from the date of the sale to identify a replacement property, and has 180 days from that date of sale to close on the purchase of the replacement property. To preserve the tax benefit of avoiding capital gains taxes on the sale of the property, an exchanger may not take possession of the sale proceeds. JSUF ¶ 2. Under the regulations that apply to Section 1031, the use of a qualified intermediary in connection with a 1031 Exchange is a "safe harbor" that will result in a determination that the taxpayer is not in actual or constructive receipt of money or other property for the purposes of Section 1031. JSUF ¶ 3; 26 C.F.R. § 1.1031(k)-1(g)(4).

Prior to the sale of 1031 Advance to Okun, 1031 Advance acted as a qualified intermediary, conducting typical exchanges in accordance with section 1031 and the regulations promulgated thereunder. JSUF ¶ 4. Clients of 1031 Advance (hereafter "Exchangers"), signed Exchange Agreements with 1031 Advance, an example of which is attached as Exhibit A to the Sturmer Declaration. *See* JSUF ¶ 5; Declaration of Debra Steel Sturmer in Support of SVLG's Motion for Partial Summary Judgment ("Sturmer Decl.") Exh. A. Under the Exchange Agreements, the Exchangers agreed to transfer their interests in the sale proceeds of relinquished

property to 1031 Advance in consideration for 1031 Advance's subsequent transfer to the Exchangers of like-kind replacement property. *Id.* ¶ 1.

Sale proceeds from the relinquished property ("Exchange Funds") were held in 1031 Advance's bank accounts in the name of 1031 Advance. JSUF ¶ 8. The parties have stipulated that 1031 Advance did not hold the Exchange Funds in trust for the Exchangers, and that the Exchange Funds were off-balance sheet assets of 1031 Advance. JSUF ¶ 9. By operation of law, 1031 Advance was not acting as an agent for the Exchangers. *See 26* C.F.R. § 1.1031(k)-1(g)(4)(i)-(ii). Pursuant to the terms of the Exchange Agreement, an Exchanger "conditionally assigns all of its right, title and interest in the Sale Contract and certain of its obligations thereunder to [1031 Advance]." Sturmer Decl., Exh. A ¶ 2.1. An exchanger had no right to request or receive anything other than like-kind property before the expiration of the exchange period, or obtain any benefits from the Exchange Funds, including interest. *Id.* ¶ 7.1.

In October 2006, the owners of 1031 Advance became interested in selling their company. Complaint ("Compl.") ¶ 29. They retained lawyers from SVLG to advise them regarding the sale, and ultimately, to perform due diligence for 1031 Advance regarding the sale to 1031 Tax Group LLC, the parent company of the 1031 Debtors of which Okun was the sole shareholder. Compl. ¶¶ 29-39. The Trustee's malpractice claim against SVLG is based upon the theory that in conducting due diligence for 1031 Advance, SVLG should have discovered that Okun was a thief. Compl. ¶¶ 43-55. The sale of 1031 Advance to 1031 Tax Group closed on December 18, 2006, and SVLG's representation of 1031 Advance ended that same day. At the time of the Stock Purchase and Sale Agreement, the Business Enterprise Value of 1031 Advance was $23.3 million plus the value of equity interest in 1031 Advance. JSUF ¶ 10.

After purchasing 1031 Advance, Okun looted the Exchange Funds and took actions adverse to the company. JSUF ¶ 12. On December 19, 2006, the day after the sale of 1031 Advance closed, Okun directed transfer of $23,245,850.42 of the Exchange Funds in 1031 Advance's bank accounts to other entities owned indirectly by Okun. JSUF ¶ 19. On December 29, 2006, another $4,769.41 of the Exchange Funds were taken from 1031 Advance's bank accounts. Between April 5, 2007 and May 10, 2007, another $11,663,965.21. *Id.* Okun used the

misappropriated funds to fund Okun's lavish lifestyle, to pay bonuses to other participants in the wrongdoing, to invest in commercial real estate, and to complete some exchange transactions in order to conceal wrongdoing. JSUF ¶ 15.

On May 10, 2007, 1031 Advance filed for Chapter 11 bankruptcy along with the other 1031 Debtors. As of the date of bankruptcy filing, $32,229,228 was the deficit in funds that 1031 Advance need to close exchanges for the Exchangers. JSUF ¶ 20.

### B. Procedural History

Several lawsuits arose after the 1031 Debtors filed for bankruptcy. On October 27, 2010, the Trustee filed the instant lawsuit asserting a malpractice claim against SVLG and seeking to recover damages from Okun's looting of 1031 Advance, including the stolen Exchange Funds. In *Hunter v. Citibank*, the Exchangers associated with all the 1031 Debtors filed a class action lawsuit against various defendants. After Judge Ware denied class certification and several parties settled their claims, the remaining parties (SVLG and the Exchangers) agreed to dismiss that lawsuit with prejudice. *See Hunter v. Citibank*, Case No. 09-2079-JW, Dkt. Nos. 566, 615. In *ASM Capital v. Okun*, the individual Exchangers which had contracted with 1031 Advance filed another lawsuit against various defendants, including SVLG. *See ASM Capital, LP, et al., v. Edward H. Okun*, Case No. 11-4825-PJH. The *ASM* action has been stayed pending the resolution of the instant case.

In this matter, SVLG previously filed a motion for summary judgment or, in the alternative, partial summary judgment. Dkt. No. 52-1. The issue pertaining to partial summary judgment was whether the Trustee had standing to recover the Exchange Funds from SVLG. *Id.* at 18-21. SVLG argued that because the lost Exchange Funds represented injuries to the Exchangers, as opposed to 1031 Advance itself, the Trustee had no standing to recover the Exchange Funds. The Trustee responded that the loss of Exchange Funds belonged to 1031 Advance, increased the amount of liabilities which 1031 Advance could not pay, and thus constituted an injury to 1031 Advance which conferred standing upon the Trustee. Judge Ware denied SVLG's motion for partial summary judgment without prejudice, found that the Trustee had standing to pursue its malpractice claim against SLVG, and stated that the issue was "not one

4

of standing, but rather of the proper measure of damages to 1031 Advance once standing is established." Dkt. No. 76 (Order … Denying Plaintiff's Motion for Partial Summary Judgment Without Prejudice) at 13-14. Finding the issue of damages to be inadequately briefed, Judge Ware invited SVLG to refile a dispositive motion on that question.

### C. The Motion

In accordance with Judge Ware's directive, SVLG filed the instant Motion for Partial Summary Judgment as to the Measure of Damages. Dkt. No. 98. SVLG argues that the loss of Exchange Funds caused by Okun's looting of 1031 Advance (an amount greater than $30 million), represents a "particularized injury" to the Exchangers, and as a matter of law, does not represent the measure of damages sustained by 1031 Advance. Thus, Defendant contends that Plaintiff's recovery in this action, if any, must be limited to the loss of interest that 1031 Advance would have earned from Exchange Funds, and perhaps the loss of fees 1031 Advance charged the Exchangers for its services.

The Trustee contends that recovery of the Exchange Funds stolen by Okun would remedy 1031 Advance's own direct injury because the Exchange Funds belonged to 1031 Advance. Because SVLG concedes that 1031 Advance did not hold the Exchange Funds in trust, according to the Trustee, 1031 Advance could only have held the Exchange Funds as its own. The Trustee argues that 1031 suffered a cognizable injury through the loss of the Exchange Funds despite the indirect injury also suffered by the Exchangers. The Trustee therefore contends that the proper measure of damages, in the event the Trustee prevails at trial, is the amount of damages proximately caused by SVLG.

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on

which the movant would bear the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact," that is, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation omitted). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

## IV. DISCUSSION

Plaintiff is Trustee of 1031 Advance's bankrupt estate, and as such, has the obligation to "collect and reduce to money the property of the estate." 11 U.S.C. § 704(1). The property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," *id.* § 541 (a)(1), including the debtor's "causes of action." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9 (1983). Because the parties agree that Okun wrongfully took the Exchange Funds, the first question the Court must answer is whether the Exchange Funds belonged to 1031 Advance or to the Exchangers at the time Okun misappropriated them.

There is no real dispute that at the time the Exchange Funds were wrongfully transferred by Okun to 1031 Tax Group, 1031 Advance, and not the Exchangers, held legal title and interest to the Exchange Funds. This was express within the Exchange Agreement. Sturmer Decl. Exh. A ¶ 2.1 ("Exchanger hereby conditionally assigns all of its right, title and interest in the Sale Contract and certain of its obligations thereunder to Intermediary"). 1031 Advance also held legal title to the Exchange Funds by operation of law. 26 C.F.R. § 1.1031(k)–1(g)(4)(iv)(A). The Exchange Funds were held in 1031 Advance's bank accounts and were listed as off-balance sheet assets of 1031 Advance. JSUF ¶¶ 8-9; *see In re Amdura Corp.*, 75 F.3d 1447, 1451 (10th Cir. 1996) ("We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established"). The Exchangers had no right to request or receive anything other than like-kind property before the expiration of the exchange period, or obtain any benefits from the Exchange Funds, such as interest earned on the Exchange Funds. *Id.*

¶ 7.1. The parties have stipulated that 1031 Advance did not hold the Exchange Funds in trust, *see* JSUF ¶ 11, and by operation of law, 1031 Advance was not acting as the Exchangers' agent, *see* 26 C.F.R. § 1.1031(k)–1g(4)(i)-(ii). These undisputed facts indicate that at the time Okun looted the Exchange Funds, they belonged to 1031 Advance.

This conclusion is bolstered by the reasoning of the judge in the bankruptcy proceedings for the 1031 Debtors. Judge Glenn held that the Exchange Funds "clearly belonged to the 1031 Debtors" while granting partial summary judgment in favor of the Trustee on a fraudulent conveyance claim against Boulder Capital LLC. *In re 1031 Tax Group, LLC*, 439 B.R. 47, 52 (2010). Judge Glenn rejected Boulder's argument that the 1031 Debtors, which included 1031 Advance, did not hold equitable title (in addition to legal title) to the Exchange Funds because that argument "inappropriately assum[ed] the existence of trusts with the Exchangers as beneficiaries." *Id*. at 71. Judge Glenn held Boulder had no standing to assert that the Exchange Funds were held in trust, and thus could not rebut the presumption that the 1031 Debtors held both legal and equitable title. *Id*. Here, SVLG has stipulated that the Exchange Funds are not held in trust. JSUF ¶ 11. If 1031 Advance did not hold the Exchange Funds in trust, it held them as its own funds.

Although SVLG does not seriously dispute that the Exchange Funds belonged to 1031 Advance, SVLG argues the looting of the Exchange Funds does not constitute a direct injury to 1031 Advance, but rather only a "particularized injury" to the Exchangers. Thus, SVLG contends the Trustee cannot recover the Exchange Funds, but only 1031 Advance's loss of interest and fees, which are the only direct injuries from 1031 Advance's ultimate demise as a solvent business entity. In response, the Trustee argues that despite the fact the Exchangers may indirectly benefit from the Trustee's recovery of the Exchange Funds, 1031 Advance--the owner of the Exchange Funds--still suffered a direct injury for which it may recover damages.

SVLG's "particularized injury" argument is essentially the same argument SVLG previously made in its motion for partial summary judgment before Judge Ware regarding the Trustee's standing to recover the Exchange Funds. Judge Ware found the issue not to be a matter of standing, "but rather of the proper measure of damages to 1031 Advance once standing is

7

established." Dkt. No. 76 at 14. SVLG has not cited any new cases which address the proper measure of damages, and instead relies on cases previously cited which discuss this issue solely in terms of standing.

"[I]t is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005) ("*Smith*") (internal quotations omitted) (holding that the wrongful expenditure of a corporation's assets constitutes an injury the corporation and thus confers standing upon the corporation's estate). This principle derives from the Supreme Court's decision in *Caplin v. Marine Midland Grace Trust*, 406 U.S. 416, 420 (1988), "in which the Court concluded that a reorganization trustee under Chapter X had no standing … to assert, on behalf of the holders of the debtor's debentures, claims of misconduct against a third party." *Williams v. Cal. 1st Bank*, 859 F.2d 664, 666 (9th Cir. 1988) ("*Williams*"). In *Williams*, the Ninth Circuit held that *Caplin* barred a liquidation trustee from asserting claims on behalf of the debtor's investors, even when the debtor's investors had assigned those claims to the trustee. *See id.*

This principle is limited, however, to instances in which a bankruptcy trustee seeks to pursue a claim *on behalf* of investors, as opposed to rectifying injuries to the estate itself. *Smith*, 421 F.3d at 1002 ("the focus of the injury is on whether the Trustee is seeking to redress injuries to the debtor itself caused by the defendants' alleged conduct"). In *Caplin*, the Supreme Court noted that the trustee sought to assert claims only on behalf of the debentures, not the estate itself, and held the applicable statute did not confer standing upon the trustee to "collect money *not owed to the estate*." *Caplin*, 406 U.S. at 428 (emphasis added). In *Smith*, the Ninth Circuit distinguished *Williams* and *Caplin* because "the Trustee is not attempting to assert claims that were assigned to him by Boston Chicken's creditors, but rather seeks to rectify injuries to Boston Chicken itself." *Id*. at 1003.

The *Smith* court also held that a trustee has standing to pursue a claim when a corporation is wrongfully deprived of its assets, despite the inevitable indirect injury also inflicted upon the

8

corporation's creditors. In other words, a company's loss of funds does not only constitute a "particularized injury" to the company's creditors. The court stated, in pertinent part:

> It is, of course, true that the dissipation of assets limited the firm's ability to repay its debts in liquidation. Acknowledgement of this fact is not, however, a concession that only the creditors, and not Boston Chicken itself, have sustained any injury. Instead, it is a recognition of the economic reality that any injury to an insolvent firm is necessarily felt by its creditors.

*Id*. at 1004. To this end, the Third Circuit has gone even further, stating "it is irrelevant that, in bankruptcy, a successfully prosecuted cause of action leads to an inflow of money to the estate that will imminently flow out again to repay creditors." *Official Committee of Unsecured Creditors v. R.F. Lafferty Co., Inc.*, 267 F.3d 340, 349 (3rd Cir. 2001) ("*Lafferty*") (addressing the question, similar to the court in *Smith*, of whether the corporation had standing to recover damages resulting from the "deepening insolvency" of the corporation). The *Lafferty* court continued by quoting a bankruptcy case at length:

> The ... assertion that this action will benefit creditors is not an admission that this action is being brought on their behalf. In a liquidation case, it is commonplace for a trustee to pursue an action on behalf of the debtor in order to obtain a recovery thereon for the estate. If the trustee is successful in the action, the recovery which he obtains becomes property of the estate and is then distributed pursuant to the scheme established by § 726(a). Simply because the creditors of a[n] estate may be the primary or even the only beneficiaries of such a recovery does not transform the action into a suit by the creditors. Otherwise, whenever a lawsuit constituted property of an estate which has insufficient funds to pay all creditors, the lawsuit would be worthless since under *Caplin* it could not be pursued by the trustee.

*Id.* (quoting *In re: Jack Greenberg, Inc.,* 240 B.R. 486, 506 (Bankr.E.D.Pa.1999)).

Applying the foregoing principles to the facts of this case, the Court finds the Trustee has standing to pursue the claim against SVLG by virtue of the injury 1031 Advance suffered when Okun wrongfully deprived 1031 Advance of its assets. This is not a case where the Trustee seeks to assert claims on behalf of the company's creditors. *Cf. Caplin*, 406 U.S. at 417; *Williams*, 859 F.3d at 665. Rather, 1031 Advance itself suffered a distinct and concrete injury when it was stripped of its assets and thus could no longer fulfill its obligations under the Exchange Agreements. *Smith*, 421 F.3d at 1003-04; *Lafferty*, 267 F.3d at 348-49. The deficit in 1031 Advance's bank accounts may constitute an indirect injury to the Exchangers, but that is of no consequence in determining the Trustee's right to recoup what has been wrongfully taken from

9

1031 Advance. *Lafferty*, 267 F.3d at 349. Thus, the loss of Exchange Funds is a cognizable injury to 1031 Advance itself.

It may seem self-evident that the 1031 Advance's cognizable injury should be accompanied by a remedy. *See Lafferty*, 267 F.3d at 351 ("one of the most venerable principles in Pennsylvania jurisprudence, and in most common law jurisdictions for that matter, is that, where there is an injury, the law provides a remedy."). Nevertheless, in *Smith*, the Ninth Circuit expressly declined to opine on that issue. *Smith*, 421 F.3d at 1004 ("In so holding, we do not opine whether the incurrence of additional debt that cannot be repaid, in and of itself, constitutes a corporate injury *remediable* by a trustee") (emphasis added). The Third Circuit also never reached that issue in *Lafferty*, as the court ultimately found that the *in pari delicto* defense barred the plaintiff's recovery. *Lafferty*, 267 F.3d at 360. In a case decided after *Lafferty*, however, the Third Circuit did provide some guidance as to the proper measure of damages. *See Thaubault v. Chait*, 541 F.3d 512 (3rd. Cir. 2008) ("*Thaubault*").

In *Taubault*, the Third Circuit considered essentially the same defense as the defendant's standing argument in *Lafferty*--that only the creditors, not the company, suffered an injury when an accountant's negligent auditing caused the company to deepen its insolvency. *See id.* at 519-20. The difference between *Lafferty* and *Thaubault* was one of timing. In *Thaubault*, the Third Circuit affirmed the award of damages in the amount the jury found to be proximately caused by the accountant's negligence. *Id.* at 523 ("Today we hold that an increase in liabilities is a harm to the company and the law provides a remedy when a plaintiff proves a negligence cause of action."). The court further stated that "[w]hen a plaintiff brings an action for professional negligence and proves that the defendant's negligent conduct was the proximate cause of a corporation's increased liabilities, decreased fair market value, or lost profits, the plaintiff may recover damages in accordance with state law." *Id.* at 520.

The Court is persuaded that a similar remedy should be available in this case, should the Trustee prevail on his claim against SVLG at trial. 1031 Advance suffered an injury when it was wrongfully deprived of its assets by Okun's Ponzi scheme. If the Trustee can prove that SVLG's malpractice was the proximate cause of this injury, then the Trustee will be able to recover an

amount of damages in accordance with California tort damages principles. *See Taubault*, 541 F.3d at 519 (applying traditional New Jersey tort damages to determine proper recovery for the amount of increased liabilities). Under California Law, "[i]n a legal malpractice action, the attorney is liable for all the damages proximately caused by the negligent act or omission." *Norton v. Superior Court*, 24 Cal.App.4th 1750, 1758 (1994) (citing *Smith v. Lewis*, 13 Cal.3d 349, 362 (1975)). This is the proper measure of damages attributable to SVLG in the event the Trustee prevails at trial.[2]

SVLG's "particularized injury" argument is not well-supported. SVLG cites *Peregrine v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal.App.4th 658 (2005), for the proposition that the plaintiff must differentiate between the separate losses to 1031 Advance and to its clients. *See id.* at 677-78 ("we can find no clear statement in [the plaintiff's] briefing that identifies the losses plaintiffs claim these corporate entities suffered, separate and apart from losses to investors, as a result of Sheppard's alleged misconduct."). However, *Peregrine* does not support SVLG's argument. Despite the lack of clarity identifying which claims were on behalf of whom, the *Peregrine* court ultimately found that the plaintiffs had stated a cognizable claim on behalf of the corporate entity. The *Peregrine* court did *not* hold that an injury to the corporate entity could not also constitute an injury to the corporation's creditors as well, and the court's citation to *Lafferty* implies the contrary.

SVLG also quotes an excerpt from Judge Glenn's order from the 1031 Debtors' bankruptcy proceedings, *In re 1031 Tax Group*, LLC, 420 B.R. 178 (Bankr. S.D.N.Y. 2009), where the court held the Trustee had no "constitutional standing to recover from Citibank money lost by the 1031 Debtors' exchange participants who were waiting to complete their 1031

---

[2] The Trustee contends the appropriate measure of damages is measured by (i) either the amount of Exchange Funds taken from the 1031 Advance bank accounts, or the amount of the deficit at the time 1031 Advance filed for bankruptcy, and (ii) 1031 Advance's share in more than $5 million in fees and costs associated with tracing its assets and unraveling the Ponzi scheme. The Court declines to address the exact amount of damages which the Trustee may recover in the event he prevails at trail--that is, whether the amount of damages will be measured by the gross or net loss of Exchange Funds to 1031 Advance. However, the Court will note that the Trustee's recovery will be limited by the amount in which 1031 Advance has actually been damaged by the loss of its Exchange Funds.

11

exchange transactions when Okun looted the funds from the Citibank bank accounts." *Id.* at 194. Judge Glenn's decision is not binding upon this Court, and to the extent Judge Glenn would hold the Trustee does not have standing to recover the Exchange Funds from SVLG, the Court respectfully disagrees. Judge Glenn applied law from the Second Circuit to determine the Trustee's constitutional standing, including *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2nd. Cir. 1991), which is heavily criticized by courts outside the Second Circuit for mixing issues of standing with the defense of *in pari delicto*. *See Lafferty*, 267 F.3d at 346-47. Judge Glenn also cited *Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085 (2nd Cir. 1995), which other courts have distinguished because the "only allegation of injury was 'unpaid obligations of the debtor to creditors.'" *Lafferty*, 267 F.3d at 347 (quoting *In re Plaza Mort. and Fin. Corp.*, 187 B.R. 37, 41 (N.D. Ga. 1995)). Thus, this Court is not persuaded by Judge Glenn's reasoning as applied to this case.

     Nor does Judge Ware's order in *Hunter v. Citibank* lend any support to Plaintiff's arguments. *See* Exhibit Q to the Declaration of Debra Sturmer in Support of SVLG's Motion (*Hunter v. Citibank*, Case No. 09-2079, Dkt. No. 264) ("*Hunter*") at 10-13. *Hunter* was filed on behalf of the all the Exchangers of the various 1031 Debtors, not the Trustee. In deciding whether the Exchangers could pursue their claims against the Cordell Defendants (money lenders involved with Okun's Ponzi scheme), Judge Ware considered whether the channeling injunction resulting from the settlement agreement between the Cordell Defendants and the Trustee barred the Exchangers from pursuing their own claims. Because the channeling injunction barred all claims that the Debtors may have asserted--as opposed to the Exchangers--the issue became "whether the Trustee could have asserted Plaintiffs' claims against the Cordell Defendants for damages due to their loss of exchange funds." *Id.* at 11. Relying on Judge Glenn's reasoning in the bankruptcy order discussed above, Judge Ware held that the Trustee would not have had standing in this "hypothetical" situation, and thus held the channeling injunction did not bar the Exchangers from pursuing their own claims. *Id.* at 12. This was the extent of Judge Ware's discussion of the issue presented here. When Judge Ware was actually presented with the question of standing in this

case, he held the Trustee had standing to pursue the malpractice claim against SVLG. Dkt. No. 76.

In sum, the Court does not believe the undisputed facts show that the loss of Exchange Funds only represent a particularized injury to the Exchangers. Rather, this loss represents a direct and cognizable injury unto 1031 Advance itself, which confers standing upon 1031 Advance to recover the Exchange Funds. Therefore, in the event the Trustee prevails on his malpractice claim against SVLG at trial, damages will be measured by the amount proximately caused by SVLG's alleged malpractice--including, that proximately caused by SVLG's alleged malpractice and the amount of damages caused by the loss of the Exchange Funds.

## V. CONCLUSION

For the foregoing reasons, SVLG's Motion for Partial Summary Judgment as to the Measure of Damages is DENIED.

IT IS SO ORDERED.

Dated: January 28, 2013

_____
Joseph C. Spero
United States Magistrate Judge

13