1  Jerome N. Lerch, Esq. (CSB #48194)
   Debra Steel Sturmer, Esq. (CSB #105276)
2  LERCH STURMER LLP
   425 California Street, Ste. 2400
3  San Francisco, California 94104
   Telephone:      (415) 217-6340
4  Facsimile:      (415) 217-2782

5  Attorneys for Defendant Silicon Valley Law Group

6

7

8                    UNITED STATES DISTRICT COURT

9      FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

10  GERARD A. MCHALE, Jr., P.A., as        )  **CASE NO. CV10-04864  JCS**
    Liquidation Trustee for the 1031 Debtors )
11  Liquidation Trust,                     )  **SILICON VALLEY LAW GROUP'S TRIAL**
                                           )  **BRIEF**
12                          Plaintiff,     )
                                           )
13  v.                                     )
                                           )  **TRIAL DATE:       April 1, 2013**
14                                         )  **COURTROOM:     G, 15th Floor**
    SILICON VALLEY LAW GROUP, a            )
15  California Law Corporation,            )
                                           )
16                          Defendant.     )
    _____     )

17                        I.  **FACTUAL BACKGROUND**

18       **A.       Introduction to SVLG's Representation of 1031 Advance and the Trustee's
                    Claim**
19

20       In this legal malpractice action, the Plaintiff as Liquidation Trustee standing in the shoes of

21  Silicon Valley Law Group's ("SVLG") former client 1031 Advance, Inc. ("1031 Advance"), seeks

22  to recover for the loss of $31-$34 million in exchange funds stolen by Edward Okun. SVLG

23  represented 1031 Advance, Inc. in connection with its sale in December 2006 to 1031 Tax Group

24  LLC, a single member LLC owned and controlled by Edward Okun. SVLG assisted 1031 Advance

25  in the conduct of its due diligence investigation into prospective purchasers, including Mr. Okun.

26  SVLG also assisted 1031 Advance in the preparation of its disclosure schedules and negotiated and

27  participated in the drafting of the Stock Purchase Agreement and Employment Agreements for 1031

28  Advance's founders.

Attorney James Chapman is a former shareholder of SVLG and was the attorney in charge of SVLG's representation of 1031 Advance.  Mr. Chapman is not a party to this action.   Mr. Chapman is a corporate lawyer specializing in mergers and acquisitions.   Mr. Chapman was assisted by associate attorney Michael Schachter, who worked in both the corporate and real estate departments of SVLG.

**B.      The Founders of 1031 Advance**

1031 Advance, Inc. was founded in January 2006 by Janet Dashiell and Steven Allred. Janet Dashiell served as President of 1031 Advance. Mr. Allred was its Vice President. Prior to founding 1031 Advance, Ms. Dashiell and Mr. Allred had decades of experience in the 1031 exchange industry and were experts in the field of 1031 exchanges. Ms. Dashiell taught continuing education courses in 1031 exchanges for the California Department of Real Estate and contributed to a number of publications on 1031 exchanges. Prior to founding 1031 Advance, Mr. Allred had founded Old Republic's 1031 exchange company and grew it into a successful business. Mr. Allred has testified as an expert in 1031 exchanges. Ms. Dashiell and Mr. Allred were such experts in the field of 1031 exchanges that when they founded 1031 Advance they drafted the template for the exchange agreement utilized by 1031 Advance themselves without the assistance of counsel.

**C.      Market Conditions in the 1031 Exchange Industry in 2006**

At the time 1031 Advance was founded in 2006 the 1031 exchange industry was unregulated. Other than the provisions of Internal Revenue Code Section 1031, which sets forth the requirements for an exchange of investment property to qualify for deferment of capital gains taxes, in 2006 there were no federal statutes that regulated the conduct of a 1031 exchange company or controlled its investment policies. There was no regulatory agency vested with authority to police the 1031 industry. There were also no California statutes or regulations specifically addressing the conduct of business of a 1031 exchange company.

Exchange companies (which are also referred to as "qualified intermediaries" or "QIs" under Section 1031) earned money in two ways. The first source of income was the nominal fees (typically $500 to $1000 per exchange) charged for the exchange service. The second source of

income was the interest that the QI earned on the exchange funds during the 45 to 180 day period in which the funds were held.

In 2006, Congress held hearings on the 1031 exchange industry in contemplation of passing legislation that would impose record keeping and reporting requirements regarding the interest earned by exchange companies (also called "qualified intermediaries") on the exchange funds held for clients. Small local and regional QIs, like 1031 Advance, perceived that the impending legislation of the QI industry would give large national banks an advantage if regulations were enacted imposing reporting requirements on the interest earned by the QIs. The national banks had the infrastructure in place to cost-effectively implement and manage the possible new administrative regulations. The "mom and pop" QIs perceived they would be at a marked disadvantage if they were forced to incur the cost of complying with the regulations being discussed on a federal level. The potential for imminent legislation was viewed as altering the playing field for small QIs in favor of the national banks and title companies. Such regulation would make it far less profitable for the small QIs and more difficult for them to compete. The possibility of legislation of QIs started a groundswell of acquisition activity in 2006. Large companies sought to acquire small regional offices throughout the United States. As a result, small QIs were being actively courted by potential suitors.

**D.      The Decision to Explore the Sale of 1031 Advance**

Ms. Dashiell and Mr. Allred were aware of the impending changes in their industry and experienced first-hand the interest of competing suitors desirous of purchasing 1031 Advance, notwithstanding that 1031 Advance was less than one year old and had only earned a modest profit. By the time Ms. Dashiell and Mr. Allred contacted SVLG regarding representation in connection with the potential sale of 1031 Advance, they had four interested prospective purchasers and had decided the time was ripe to sell their startup. There was a race within the industry to capture certain regional markets where the real estate market was especially hot. Ms. Dashiell and Mr. Allred were aware of the large sums that were being offered for small companies like theirs.

All the market conditions were ripe for Ms. Dashiell and Mr. Allred to immediately reap a large profit on their investment. 1031 Advance was started with a contribution of less than $25,000 in cash, and by the close of its first year it had earned a profit of approximately $160,000. Ms. Dashiell and Mr. Allred knew of small QIs that were sold for multiple millions of dollars. They were pleased – but not surprised – when they received a $2.5 million unsolicited offer for 1031 Advance from a suitor. They knew there was a market for their company that they could capitalize and they sought SVLG's advice on the mechanics of selling their business.

**E. 1031 Advance Retains SVLG**

1031 Advance retained SVLG on October 23, 2006. Mr. Chapman initially counseled Ms. Dashiell on negotiation strategies for dealing with the prospective purchasers; non-disclosure agreements, and the conduct of due diligence on the prospective purchasers. Discussions with two of the prospective purchasers of 1031 Advance rapidly progressed and SVLG was authorized by 1031 Advance to conduct a due diligence investigation into two of the suitors, Capital Reef and Edward Okun.

**F. SVLG Conducts Due Diligence on Two Suitors for 1031 Advance**

SVLG conducted a search of public records and national data bases and issued memoranda to 1031 Advance on their results. SVLG determined that there was no record of any significant litigation against Edward Okun. SVLG found this notable given that Mr. Okun was a real estate developer and real estate developers were often involved in litigation. Mr. Okun had no criminal record. SVLG's investigation into Capital Reef raised questions regarding an SEC investigation. Upon learning of the SEC investigation, Ms. Dashiell elected not to pursue further negotiations with Capital Reef. Ms. Dashiell concentrated her efforts on pursuing Mr. Okun's interest in purchasing her company.

**G. Ms. Dashiell and Mr. Allred Meet with Mr. Okun**

In mid-November 2006, Mr. Okun invited Ms. Dashiell and Mr. Allred to Miami to meet with him on his yacht to have face to face discussions regarding his interest in purchasing 1031 Advance. Ms. Dashiell, who had the principal interface with SVLG during the course of its

representation, did not ask SVLG to attend this meeting with Okun. Ms. Dashiell returned from her meeting with Okun and advised SVLG that she had reached an agreement in principle to sell 1031 Advance to Okun for $2.5 million, which is the price that Capital Reef had offered for 1031 Advance. Ms. Dashiell had named the price and Mr. Okun had agreed, subject to due diligence and negotiation of the written agreements for the sale and future employment of Ms. Dashiell and Mr. Allred.

Ms. Dashiell related to SVLG that Mr. Okun's business model was to create a large national network of exchange companies. He intended to build this network by acquiring local QIs, and had previously purchased 5 QIs located in Connecticut, Texas, Colorado, Florida and Massachusetts. Ms. Dashiell related to SVLG that Mr. Okun could earn interest at a much larger rate on exchange funds by having all of his QIs utilize the services of one national bank. In this fashion, Mr. Okun could more effectively compete with the banks and title companies entering the market. Mr. Chapman thought that the business model that Ms. Dashiell described made a lot of sense.

1031 Tax Group was the holding company that Mr. Okun used to acquire the QIs. Mr. Okun told Ms. Dashiell that if he bought 1031 Advance he wanted her to not only remain President of 1031 Advance, but also to become President of the whole 1031 Tax Group. Mr. Okun presented quite an opportunity for Ms. Dashiell, as he offered her a salary of $300,000 per year. Mr. Allred would stay on with 1031 Tax Group in his current role, but was not interested in a management position with 1031 Tax Group.

**H.    SVLG and Ms. Dashiell Conduct Further Due Diligence**

Mr. Chapman prepared a Due Diligence check list for Ms. Dashiell to send to Mr. Okun to obtain further information about the financials of 1031 Tax Group. SVLG requested various financial and other corporate documents on 1031 Tax Group.

Ms. Dashiell independently conducted due diligence on Mr. Okun and 1031 Tax Group. Mr. Chapman recommended that Ms. Dashiell speak with the sellers of the 5 other QIs that Mr. Okun had purchased as part of the due diligence investigation. Ms. Dashiell conveyed her request to Mr. Okun.

Mr. Okun explained to Ms. Dashiell that he did not wish for her to speak with the sellers of his other QIs. The sellers of the other QIs previously purchased by 1031 Tax Group continued to run their former companies. One of those sellers, Todd Pajonas, was currently President of 1031 Tax Group. Mr. Okun did not want Mr. Pajonas or any of the others to learn that he intended to bring in Ms. Dashiell to run the whole group, because he was concerned that it would "rock the boat" and cause internal dissension. Mr. Okun also indicated that he was replacing Mr. Pajonas because he believed that Mr. Pajonas had stolen money from 1031 Tax Group. Ms. Dashiell relayed Mr. Okun's desire that she not contact the former sellers to Mr. Chapman. In Mr. Chapman's evaluation, Mr. Okun's reason for asking Ms. Dashiell not to contact the other sellers was not out of the ordinary.

I.       **Investment of Exchange Funds**

Sometime after the initial meeting with Mr. Okun on his yacht, Ms. Dashiell related to SVLG that Mr. Okun had informed her that he had borrowed exchange funds from 1031 Tax Group in the past to act as a short-term bridge loan to his real estate company, Investment Properties of America ("IPofA"). IPofA was in the business of buying commercial properties and syndicating them through the sales of tenancies in common. IPofA's portfolio of real estate had a value in excess of $600 million. Mr. Okun stated that this short term borrowing of exchange funds allowed IPofA to make a favorable, quick closing on the purchase of real estate. Mr. Okun related that the exchange funds had been repaid in a very short period of time at 8% interest (after conventional financing was obtained), and that the loan was secured by the real property and his personal guarantee.

Ms. Dashiell had no problem with the concept of exchange funds being loaned or invested on a secured, short-term basis. Ms. Dashiell and Mr. Allred were aware that other exchange companies arbitraged a portion of their exchange funds to earn a higher yield on the exchange fund. Mr. Chapman knew that there was no legal prohibition against investing exchange funds, as there were no statutes or regulations that controlled the investment of exchange funds.

Ms. Dashiell has testified in this case that she knew that the form of exchange agreement in use by 1031 Advance at the time of the sale required the exchange funds to be held by 1031 Advance in a bank account at a FDIC financial institution in an account in the name of 1031 Advance. Ms. Dashiell testified that she knew that if, after the sale, 1031 Tax Group intended to do anything with 1031 Advance's exchange funds other than hold them in a bank account in 1031 Advance's name, that the exchange agreement would have to be changed to disclose to exchanger clients that the exchange funds may be invested by 1031 Advance.

Ms. Dashiell requested that SVLG include a provision in the Stock Purchase Agreement that would ensure that 1031 Tax Group never missed an exchange closing. Ms. Dashiell and SVLG jointly drafted and proposed a "liquidity provision" to Mr. Okun that would limit 1031 Tax Group's investment to no more than 30% of the exchange funds. 1031 Tax Group's attorneys explained that the proposed "liquidity provision" was unworkable because the percentage of exchange funds retained would fluctuate whenever a large exchange was closed. Ultimately, the parties agreed to include a provision in the Stock Purchase Agreement that obligated Mr. Okun to always maintain sufficient liquidity to close exchanges when they came due and to engage in only commercially reasonable investments pursuant to investment guidelines.

**J.      1031 Tax Group's Lawyers Balk at SVLG's Press for Due Diligence**

In response to SVLG's requests for due diligence, 1031 Tax Group was not forthcoming with its financial information in a timely fashion. SVLG pressed the attorneys for 1031 Tax Group for the requested financial information, and Mr. Okun's lawyers at Klueger Peretz balked. The Klueger Peretz lawyers took the position that the scope of SVLG's requested due diligence on behalf of the seller, and insistence on detailed financial information on the prospective purchaser, was not the norm for a seller. SVLG advised Ms. Dashiell and Mr. Allred about 1031 Tax Group's position that the purchaser should not have to share this detailed financial information with the seller. SVLG advised Ms. Dashiell and Mr. Allred that the transaction carried risk, because there were many unknowns about Mr. Okun and 1031 Tax Group.

**K.     SVLG Advises of the Risks of Going Forward with the Sale Notwithstanding Incomplete Due Diligence; Ms. Dashiell and Mr. Allred Nevertheless Elect to Sell 1031 Advance**

Mr. Okun had advised Ms. Dashiell that outside accountants were recreating books left in shambles by the soon to be former President of 1031 Tax Group, Todd Pajonas. Mr. Chapman had experience with other purchasers and sellers whose financial records were in disarray and could not readily be produced. As a result, Mr. Okun's reason for not providing financials did not ring false to Mr. Chapman.

Although there were unknowns about Mr. Okun and 1031 Tax Group, SVLG had no objective reason to doubt Mr. Okun's good faith. There was not a hint of scandal about Mr. Okun. SVLG had no actual information that suggested anything untoward about Mr. Okun or 1031 Tax Group. Nevertheless, SVLG advised Ms. Dashiell of the risks of the transaction given the unanswered questions about Mr. Okun's financials and the inability to speak with the former sellers.

Ms. Dashiell again spoke privately with Mr. Okun without SVLG's involvement to discuss her requests for additional due diligence. After having this private conversation with Mr. Okun, Ms. Dashiell instructed SVLG to move forward with the transaction without pressing further for the financials or the ability to speak with the other sellers. Ms. Dashiell agreed to accept 1031 Tax Group's balance sheet, which was provided to her. Notwithstanding the instruction from their client to complete the sale, and the push by the client to complete it as soon as possible, SVLG made a further attempt to obtain other financial information from Mr. Okun's lawyers, and Mr. Okun's lawyers again demurred.

Ms. Dashiell was anxious to consummate the deal. Ms. Dashiell and Mr. Allred elected to go forward with the sale to Mr. Okun with full knowledge that the due diligence was incomplete, that there were unanswered questions and there was risk. Ms. Dashiell was looking forward to becoming the President of a national QI and earning a salary greater than she had ever before earned in any prior position. Two and half million dollars was an excellent return on their investment!

**L.     The Cessation of SVLG's Representation is Contemporaneous with the Close of the Stock Purchase Transaction**

On December 18, 2006 the Stock Purchase Agreement was signed by Janet Dashiell, Steven Allred and Edward Okun on behalf of 1031 Tax Group LLC. The purchase price of $2.5 million was wire transferred by 1031 Tax Group to SVLG's trust account on December 19, 2006 and immediately thereafter disbursed by SVLG to Ms. Dashiell and Mr. Allred.

SVLG's representation of 1031 Advance ended upon Edward Okun's acquisition of 1031 Advance. Mr. Okun's companies, including 1031 Tax Group, had their own stable of lawyers at the Klueger Peretz law firm in Miami. SVLG provided no legal advice or other representation to 1031 Advance after the stock sale closed.

BAJI 6.37.3 instructs that the duty of the attorney ends when the attorney's work on behalf of the client is complete. The agreements were signed, the purchase price was paid, and there was no further legal work for SVLG to accomplish on behalf of 1031 Advance. Neither Ms. Dashiell nor anyone else on behalf of 1031 Advance ever requested that SVLG render any further legal service to 1031 Advance.

**M.     Janet Dashiell and Steven Allred Wire $23 Million in 1031 Advance Exchange Funds to a Bank Account in the Name of 1031 Advance Immediately After Closing without SVLG's Knowledge**

The cessation of SVLG's relationship is significant because SVLG had no knowledge of the extraordinary and unexpected events that ensued immediately thereafter. The Stock Purchase Agreement by which Mr. Okun became the beneficial owner of 100% of the shares of stock did not contain any provision requiring the $23 million in exchange funds to be transferred from 1031 Advance to 1031 Tax Group. The absence of such a provision makes sense, because the corporate entity 1031 Advance had not changed; only the ownership of the shares changed. Therefore there was no reason for the exchange funds to leave 1031 Advance's bank account. Janet Dashiell continued as President of 1031 Advance, as she had been before the sale, and she and Mr. Allred remained signatories on 1031 Advance's bank account.

Everyone involved in the transaction – Janet Dashiell, Steven Allred, the lawyers at SVLG and Okun's lawyers knew that the terms of 1031 Advance's exchange agreements required the

funds to be maintained in a bank account in the name of 1031 Advance. As noted above, Janet Dashiell was an expert in the 1031 exchange industry and personally drafted the template exchange agreement that 1031 Advance used both before and after the sale to Okun. 1031 Advance promised in its exchange agreements to hold the exchange funds in an account in its name for the duration of the exchange and Janet Dashiell knew that 1031 Advance was required to keep those funds in an account in its own name.

Unbeknownst to SVLG, for several days prior to the consummation of the stock sale, Janet Dashiell had one-on-one communications with Okun's self-described "right hand person" Lara Coleman. Coleman was the Chief Operating Officer of Okun's real estate syndication company Investment Properties of America ("IPofA") but she performed many services for 1031 Tax Group. Coleman was involved in the due diligence and negotiations leading up to Okun's purchase of 1031 Advance. Between December 12 and December 19, 2006, Ms. Coleman and Ms. Dashiell exchanged multiple emails about the amount of exchange funds on deposit with 1031 Advance, the identity of 1031 Advance's exchanger clients for whom 1031 Advance had opened accounts in its own name "for the benefit of" the exchanger clients, and how much of the $23 million in exchange funds on deposit with 1031 Advance would be transferred to 1031 Tax Group and how much would be held back for 1031 Advance to for the imminent closing of exchanges. Janet Dashiell and Lara Coleman worked out all of these details privately between them. SVLG was not apprised of Janet Dashiell's communications with Lara Coleman, nor was SVLG copied on any of the emails between Ms. Dashiell and Ms. Coleman. SVLG had no knowledge that Janet Dashiell breached 1031 Advance's exchange contracts on December 19 by wire transferring funds to 1031 Tax Group until long after 1031 Advance declared bankruptcy.

When Janet Dashiell and Steven Allred signed the wire transfer instructions releasing the $23 million from 1031 Advance's account and transferring it to 1031 Tax Group's Wachovia account, they were acting within the scope of their respective duties as President and Vice-President of 1031 Advance. By virtue of that wire transfer, 1031 Advance acting through Edward Okun, Janet Dashiell and Steven Allred committed the tort of conversion – the $23 million in exchange funds

was no longer on deposit with 1031 Advance in accordance with contractual terms previously agreed to between 1031 Advance and its exchanger clients. The $23 million in exchange funds was transferred to an account in the name of 1031 Tax Group that Mr. Okun, acting through his co-conspirator Lara Coleman, controlled. Mr. Okun then converted millions of dollars in exchange funds to uses other than as set forth in the exchange agreement.

**N.     Janet Dashiell Consults with Mr. Okun on the Modification of the Exchange Agreements Immediately after the Sale**

Less than one week after the sale closed,  Mr. Okun emailed Ms. Dashiell regarding the proposed modification of the 1031 Advance exchange agreement to allow for investment outside of a bank. Ms. Dashiell recommended that the new language say as little as possible about how and where the exchanges funds may be invested. Mr. Okun's lawyers at Klueger Peretz and his new in-house general counsel, Richard Simring, were charged with the task of drafting new language for the exchange agreements. They naturally sought Ms. Dashiell's input because it would soon be announced that she had assumed the presidency of 1031 Tax Group.

**O.     Janet Dashiell Is Mandated to Use the New Form of Exchange Agreement and Communicates that Instruction to the QIs of 1031 Tax Group; Janet Dashiell then Rescinds that Instruction**

By the end of January 2007 a new template for the exchange agreement had been prepared that did not obligate 1031 Advance to maintain the exchange funds in an account in the name of 1031 Advance. In-house counsel Richard Simring commanded Ms. Dashiell to begin use of the new form of agreement immediately. Mr. Simring believed that Ms. Dashiell clearly understood the importance of his mandate. Mr. Simring testified that there was to be no negotiation on this point. Ms. Dashiell conveyed this instruction to 1031 Tax Group on January 31, 2007. The managers of the other 5 QIs pushed back about the new form and complained that they thought it would hinder their ability to market to new clients. As a result, without consulting Mr. Simring or any other attorney, Ms. Dashiell on her own rescinded the instruction to use the new form of exchange agreement the next day, on February 1, 2007. 1031 Advance, therefore, continued to use its old form of exchange agreement and continued to accept new exchanger money in violation of the

agreement until it declared bankruptcy. As a result, 1031 Advance was committing fraud every time it accepted exchange client money.

**P.      Janet Dashiell Learns that Mr. Okun is Misappropriating Exchange Funds But Does Nothing to Stop Mr. Okun's Theft**

During the first week of January 2007 Ms. Dashiell met with other executives of 1031 Tax Group at 1031 Advance's offices in San Jose. Ms. Dashiell met Lara Coleman, the Chief Operating Officer for IPofA and self-described "right hand" of Edward Okun. Ms. Dashiell also met with David Field, the Chief Financial Officer of Okun Holdings. Mr. Field testified at deposition that Ms. Dashiell knew all about Mr. Okun's use of exchange funds for non-exchange purposes in January 2007.

During the first month and a half of her tenure as President of 1031 Tax Group, although Ms. Dashiell could have obtained access to 1031 Advance and 1031 Tax Group's banking records, she did not do so. Ms. Dashiell left the financial details and exchange account banking to Lara Coleman. Ms. Dashiell testified that she was occupied traveling around country to the offices of the other QIs trying to implement cost controls and get a handle on 1031 Tax Group's many personnel issues.

Mr. Okun had assured Ms. Dashiell in their pre-purchase discussion on his yacht that he would never borrow funds without her knowledge, express consent and a signed promissory note secured by real property. In February 2007, Ms. Dashiell learned that Mr. Okun had taken an ostensible "loan" of $2,000,000 from exchange funds without her advance consent. Ms. Dashiell objected that Mr. Okun had not obtained her prior consent and requested a copy of the promissory note. Mr. Okun had Ms. Coleman create a promissory note, and provided it to Ms. Dashiell. Despite Ms. Dashiell's ostensible objection to Mr. Okun "borrowing" without her consent, Mr. Okun continued instruct Ms. Coleman to "loan" exchange funds to IPofA, and used those funds to purchase luxury items like helicopters and expensive imported cars and to make payroll.

By February 2007 Ms. Dashiell became aware that Mr. Okun had taken $18,000,000 in exchange funds since he purchased 1031 Advance. Ms. Dashiell knew that none of the exchange

agreements allowed Mr. Okun to utilize those funds. Ms. Dashiell knew that Mr. Okun's conduct was wrong. Given her knowledge and failure to act, Ms. Dashiell was not an "innocent insider." Ms. Dashiell was complicit in Mr. Okun's misappropriation of exchange funds.

More significantly, by this time Ms. Dashiell also knew that 1031 Tax Group had a staggering $100,000,000 deficit in exchange funds. In February, Ms. Dashiell started to receive cash reports on a daily basis that showed the growing gap between what 1031 Tax Group needed to close exchanges and the cash that was on at hand on any given day. At one point, 1031 Tax Group had in its accounts less than 5% of the total exchange funds that it should have had on deposit. Ms. Dashiell did nothing but continue to market for new exchange business under false pretenses in order to get more money into the company.

**Q.     Mr. Okun Was the Sole Relevant Actor with Respect to 1031 Advance's Transfer of Exchange Funds**

Mr. Okun was not a signatory on any of 1031 Tax Group or 1031 Advance's bank accounts. This small detail was no impediment to Mr. Okun's access to the exchange funds. One of the services that Mr. Okun's "right hand," Lara Coleman, provided to 1031 Tax Group and 1031 Advance was the maintenance of the bank accounts that held the exchange funds and processing of requests for the issuance of exchange funds when they were needed to complete exchanges. If an exchange needed to be funded in the ordinary course of business, the request would be made to Lara Coleman and she would initiate the instructions to one of her subordinates to make the wire transfer. In the same vein, if Mr. Okun wanted exchange funds transferred to his personal account to pay bills or buy a toy or to IPofA to make payroll, he instructed Lara Coleman to make the transfer and Lara Coleman made it happen.   Ms. Coleman has since admitted her role facilitating Mr. Okun's criminal transfer of exchange funds and was sentenced to 10 years in federal prison.

Ms. Dashiell may have carried the title of President, but in actuality she had no control over Mr. Okun's transfer of funds. Even if one were to accept the notion that Ms. Dashiell was innocent, Ms. Dashiell did nothing to stop Mr. Okun, and in point of fact there was nothing she could do to prevent Lara Coleman from transferring money to Mr. Okun at his whim. Instead of immediately

resigning her lucrative and prestigious position, and reporting Mr. Okun to the authorities, Ms. Dashiell worked ever harder to market new business and bring more exchange funds into 1031 Tax Group. Millions of dollars were taken in by 1031 Advance as a result of Ms. Dashiell's continued marketing efforts to bring in new exchange funds to close old exchanges at a time when Ms. Dashiell knew Mr. Okun was siphoning off money.

**R.     Ms. Dashiell Discloses Her Role in Mr. Okun's Scheme and Mr. Allred Immediately Gives his Notice of Resignation**

Ms. Dashiell concealed Mr. Okun's misappropriation from Mr. Allred, her former partner in 1031 Advance who continued on as Vice President of 1031 Advance and 1031 Tax Group. In March 2007, Mr. Okun instructed Lara Coleman to transfer $4,000,000, and then another $700,000, to his personal accounts. Lara Coleman and David Field related these requests to Ms. Dashiell, and Ms. Dashiell approved of the transfer of these exchange funds. Ms. Dashiell finally disclosed these activities and her role in them to Mr. Allred. Mr. Allred gave notice of his resignation to Ms. Dashiell that same day, because he knew what she was doing was wrong and wanted no part of it.

**S.     Richard Simring Warns Janet Dashiell She Could Go to Prison**

Richard Simring, Mr. Okun's general counsel, did not know that Ms. Dashiell rescinded the instructions to use the new form of exchange agreement that allowed for the investment of exchange funds until sometime in March 2007. When Mr. Simring found out that Ms. Dashiell had ignored his mandate, he was shocked and angry. Mr. Simring confronted Ms. Dashiell and told her that she could go to prison, that they *all* could go to prison, for accepting exchange funds from exchangers under contracts that did not permit investment. Ms. Dashiell had been accepting money under false pretenses by falsely representing to exchanger clients that the exchange funds would be held in a bank account in 1031 Advance's name, when she knew full well that the exchange funds were held in a bank account in 1031 Tax Group's name that Mr. Okun treated as his personal piggy bank.

**T.     Janet Dashiell Seeks Legal Advice from James Chapman, who has joined the law firm Nixon Peabody**

After Ms. Dashiell's confrontation with Mr. Simring, Ms. Dashiell did two things. First, she opened up a bank account for 1031 Advance at Countrywide and transferred some exchange funds from 1031 Tax Group into that account. Ms. Dashiell's transfer of funds was ineffective to stop Mr. Okun from further misappropriation of exchange funds. One month later, immediately after Ms. Dashiell's left her employment with 1031 Advance/1031 Tax Group, Mr. Okun caused 1031 Tax Group, as sole shareholder of 1031 Advance, to enact the corporate resolution necessary to appoint Richard Simring as President of 1031 Advance. Mr. Simring presented his corporate authority to Countrywide bank and obtained all of the 1031 Advance funds on deposit at Countrywide. Mr. Okun then used those funds for his own personal purposes.

 Second, Ms. Dashiell contacted James Chapman, who had left SVLG and joined Nixon Peabody. Ms. Dashiell sought personal legal advice from James Chapman, and she has not waived her attorney/client privilege with respect to her communications with Mr. Chapman in March 2007. Mr. Chapman referred Ms. Dashiell to criminal attorneys in Nixon Peabody's Washington D.C. office who had government contacts. Mr. Chapman's colleagues arranged for Ms. Dashiell to meet with the federal investigators in early April 2007. Ms. Dashiell was given "queen for a day" status, immunizing her from anything she disclosed to the government that day. Ms. Dashiell ultimately cooperated with the government's investigation and prosecution of Edward Okun, Lara Coleman, David Field and Richard Simring. Those four went to prison. Ms. Dashiell did not.

**U.     The Hidden Scheme That Was Concealed from SVLG by Mr. Okun's Lawyers and Co-Conspirators**

As a result of the bankruptcy of 1031 Tax Group and 1031 Advance,  and the ensuing criminal prosecution and conviction of Edward Okun on 23 counts of mail fraud, wire fraud and money laundering, it has been revealed that Mr. Okun's commenced his criminal endeavors in August 2005 when he purchased his first qualified intermediary company ("QI"). Mr. Okun immediately looted the client exchange funds temporarily held by that QI for his own use. Mr. Okun purchased another 4 QIs in 2005 and 2006. Mr. Okun viewed his network of 5 other qualified

intermediary ("QIs") companies as a means of obtaining ready access to quick cash. He is currently in prison in Texas and will not be testifying at trial either in person or via deposition. The Trustee estimates that Mr. Okun stole in excess of $150 million in client exchange funds held by the 6 qualified intermediary companies he owned and operated.

At the time that Mr. Okun was in negotiations to purchase 1031 Advance in November/December 2006, Mr. Okun's in-house lawyers at IPofA, Eric Perkins and Christopher Hoctor, were investigating the extent of IPofA's borrowing of exchange funds in an effort to determine how much was "missing." Mr. Perkins and Mr. Hoctor concluded that Mr. Okun was buying 1031 Advance in order to loot its exchange funds. Instead of blowing the whistle on Okun, Mr. Perkins and Mr. Hoctor resigned. 1031 Tax Group's chief financial officer Jeff Zacarias, who was also involved in the investigation of the "missing" exchange funds also resigned in this time period.  Todd Pajonas, then President of 1031 Tax Group, who had full knowledge of Mr. Okun's looting of exchange funds and the huge deficit, negotiated his resignation and reached a large monetary settlement with Mr. Okun. Mr. Okun paid Mr. Pajonas off to keep Mr. Pajonas from becoming a "whistleblower." Mr. Pajonas accepted his money and quietly went away. Mr. Okun's outside counsel, the law firms of McGuire Woods and Kutak Rock resigned from further representation of 1031 Tax Group and Mr. Okun when they obtained knowledge of his misappropriation of exchange funds. Before resigning, Timothy Heaphy at McGuire Woods counseled Mr. Okun to make sure that on a going forward basis he modified the exchange agreements to specifically allow for the investment of exchange funds. Mr. Heaphy (who was a former deputy United States Attorney for the Western District of Virginia and now serves as the U.S. Attorney in that district)  believed that changing the exchange agreement to state that the money would be invested would prevent Mr. Okun from committing fraud on future exchangers. Mr. Heaphy further advised Mr. Okun that assuming 1031 Tax Group never missed an exchange, there was low risk that law enforcement would find out about Mr. Okun's activities.

Mr. Okun then retained Klueger Peretz and Richard Simring as new lawyers for 1031 Tax Group. Klueger Peretz and Richard Simring immediately learned from Mr. Okun that he had been

misappropriating exchange funds. Mr. Simring, like Mr. Heaphy, told Mr. Okun that the exchange agreements had to be modified to allow for investments.

All of the senior executives of 1031 Tax Group had knowledge of Mr. Okun's misdeeds. All of Mr. Okun's inside and outside counsel had knowledge of Mr. Okun's misappropriations. Not one of them disclosed any of this information to either SVLG or Janet Dashiell during the due diligence process. Since no government investigation had commenced, and there was a conspiracy of silence within 1031 Tax Group, SVLG had no way of obtaining this information about Mr. Okun. Even if SVLG had continued to press for financials, there is every reason to believe that Mr. Okun would have given false financials to SVLG. Even if SVLG had been allowed to speak with the sellers of Okun's other QIs, SVLG would have learned nothing because these sellers also transferred their funds to 1031 Tax Group upon the sale of their exchange companies and thereafter had no idea what Mr. Okun was doing with the funds.

**V.    Mr. Okun's Scheme Collapses**

Mr. Okun's scheme started to unravel in March and April 2007. The deficit of exchange funds was so severe that 1031 Advance and 1031 Tax Group were in danger of being unable to fund exchanges when due. At the end of April, at about the time Ms. Dashiell left 1031 Tax Group, Mr. Okun sent Mr. Simring to Colorado to meet with the managers of IXG, the Colorado QI that Okun had purchased from the McCabes, in order to obtain the funds that IXG maintained in a local bank account. Mr. Okun and Ms. Dashiell had allowed IXG to maintain local bank accounts in Colorado to hold a portion of IXG's exchange funds to facilitate funding closings, as IXG handled the accounting for one of Okun's other QIs, NES. The McCabes were officers of IXG and the only signatories on IXG bank accounts but they had no role whatsoever in the day to day management, operation or control of either 1031 Tax Group or 1031 Advance. The McCabes had no access to the exchange funds on deposit at 1031 Tax Group and had no corporate authority that they could exercise to stop Mr. Okun. In response to Mr. Simring's demand for the IXG exchange funds, the four members of IXG's management team immediately resigned.

1031 Tax Group was in shambles, because it lost two big producers, Ms. Dashiell and Dan McCabe. Since hardly any new money was coming in the door, 1031 Tax Group was unable to close several exchanges. Mr. Simring and Mr. Field wrote "lulling letters" to exchange clients offering false explanations about a temporary liquidity problem and offering higher interest rates to assuage the exchanger clients for the delay in returning their funds. Mr. Simring and Mr. Field ultimately pleaded guilty to their role in the scheme to defraud the exchanger clients. Mr. Field remains in prison. Mr. Simring was released in September 2012.

It was only a few weeks later that 1031 Advance, 1031 Tax Group, IPofA and the other QIs filed for bankruptcy.

**W.     SVLG Did Not Cause the Loss of 1031 Advance Exchange Funds**

Although Mr. Okun misappropriated millions of dollars of 1031 Advance exchange funds, 1031 Tax Group did continue to pay out on 1031 Advance's exchanges when they came due until May 2007. By the time 1031 Advance declared bankruptcy in May 2007 it had a $31 million deficit in exchange funds. *SVLG did not cause 1031 Advance to lose any of the $31 million.* The loss of $31 million was caused by the conversion of funds by 1031 Advance, commencing with the transfer on December 19, 2006, which was unbeknownst to SVLG. Thereafter, Mr. Okun, the sole member of 1031 Tax Group LLC, which owned 1031 Advance, looted the money.

Of the exchanger clients whose exchange funds made up the $23 million on deposit that Ms. Dashiell and Mr. Allred transferred to Mr. Okun after the sale closed, 1031 Advance closed all but $4.5 million of those exchanges. Thus 1031 Advance's actual loss of exchange funds on deposit at the time of the sale is limited to the $4.5 million not paid out to those exchangers with funds on deposit as of December 19, 2006. Although 1031 Advance lost exchange funds of $23 million, 1031 Advance has no corresponding liability except with respect to the $4.5 million in exchanges that did not close.

The Trustee sought to amend its complaint last year to assert a subrogation claim with respect to the funds of other QIs allegedly used to fund 1031 Advance's exchanges after the sale. Judge Ware denied the Trustee leave to amend due to the prejudice such a late amendment would

have on SVLG. See Doc. No. 76. The only party to assert claims against SVLG is 1031 Advance. If 1031 Tax Group or the other QIs lost exchange funds because they were used by to close 1031 Advance exchanges they could have asserted a subrogation claim against 1031 Advance and SVLG, but they did not. As 1031 Advance has no liability to repay these entities, the loss of the asset gave rise to no corresponding liability and 1031 Advance has not been damaged in the sum of $23 million.

Assuming, arguendo, that a jury concludes SVLG is somehow negligent, then SVLG is still entitled to argue that it did not cause the loss of any exchange funds and that its liability is zero. The plaintiff must prove the value of the asset actually lost by 1031 Advance as a result of SVLG's conduct. That number could be zero or it could be it could be $4.5 million. To instruct otherwise on damages would deprive SVLG of its causation defense.

## II.  SVLG'S DEFENSES

Based on the facts set forth above, and the expert witness testimony it will present at trial, SVLG maintains that it did not breach the standard of care. SVLG further contends that its conduct was not the legal cause of any damage to 1031 Advance. SVLG's role in the sale to Mr. Okun was not the proximate cause of damage to 1031 Advance. Edward Okun's theft of millions of dollars was an unforeseeable, extraordinary event that could not reasonably have been anticipated by SVLG, which intervened to cause 1031 Advance's loss of exchange funds. As a result, even if found to be negligent, SVLG is relieved of liability by virtue of its superseding cause affirmative defense.

As the sole owner of 1031 Advance, Mr. Okun's criminal conduct and the misdeeds of his executive employees, including Ms. Dashiell, is imputed to 1031 Advance. Although Mr. Okun's conduct was admittedly adverse to the corporation, Mr. Okun's conduct is imputed because he was the sole relevant actor with respect to the decisions to misappropriate exchange funds and to transfer them for his own use. There was no "innocent insider" that stopped Mr. Okun's crimes. Ms. Dashiell and Ms. Coleman had knowledge of Mr. Okun's misconduct and failed to stop it. While Ms. Dashiell carried the title of President, she did not exercise her corporate authority to take

1031 Tax Group's funds under her control. Although Ms. Dashiell "blew the whistle" on Mr. Okun to save herself from prison, she is not an "innocent insider."

     Contemporaneous with the filing of this fact-based trial brief, SVLG has filed its legal memorandum supporting the Disputed Jury Instructions regarding the agency/ imputation issues; the unclean hands defense; and  the superseding cause affirmative defense. This separate memorandum sets forth the case law supporting the legal basis for the imputation of misconduct; application of the unclean hands doctrine; and, the superseding cause defense. Rather than repeat herein the legal authority cited in the jury instruction legal memorandum, SVLG respectfully refers the Court to its argument in support of its Imputation, Unclean Hands and Superseding Cause instructions.

### III.  COMMON ISSUES OF FACT EXIST BETWEEN SVLG'S EQUITABLE AND LEGAL AFFIRMATIVE DEFENSES

     Unclean hands is an equitable defense that may be asserted in a legal action, and the application of the unclean hands doctrine remains primarily a question of fact. *Mattco Forge, Inc. v. Arthur Young & Co.* (1992) 5 Cal.App.4[th] 392, 407. The United States Supreme Court has held that "where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or *by a court trial of a common issue existing between the claims.*" *Ross v. Bernhard,* 396 U.S. 531, 537–38 (1970) (emphasis added).

     SVLG's unclean hands defense is based on disputed factual issues that are common to SVLG's superseding cause and comparative negligence affirmative defenses.[1] SVLG contends that the misconduct of Edward Okun, the beneficial owner of 1031 Advance, Inc., and misconduct of 1031 Advance's President Janet Dashiell, which commenced on December 19, 2006 immediately after the sale, establishes SVLG's affirmative defenses of unclean hands, comparative negligence, fault of others and superseding cause.

---

[1] Please refer to the Joint Draft Pretrial Conference Order for SVLG's detailed statement of the factual issues that remain to be tried regarding the unclean hands defense, all of which factual issues also pertain to 1031 Advance's comparative negligence.

1

"When legal and equitable claims are joined in the same action, the trial judge has only limited discretion in determining the sequence of trial and "that discretion ... must, wherever possible, be exercised to preserve jury trial." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510, 79 S.Ct. 948, 956, 3 L.Ed.2d 988 (1959). "[O]nly under the most imperative circumstances ... can the right to a jury trial of legal issues be lost through prior determination of equitable claims." Id. at 510-11, 79 S.Ct. at 956-57 (citation omitted).."  *Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.* (1989) 890 F.2d 165, 170.

2

3

4

5

6       In *Dollar Systems* the court of appeal determined that the trial court did not abuse its

7   discretion in denying a jury trial on the equitable claims because the legal and equitable claims were

8   *entirely independent*. *Id*. To do otherwise, "[p]rior non-jury trial of the equitable claims may

9   infringe the right to jury trial on the legal claims because of the collateral estoppel or *res*

10  *judicata* effect of a prior judicial determination of issues common to the two sets of

11  claims." *Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 690 (9th Cir.), *cert.*

12  *denied,* 429 U.S. 940 (1976).

13      SVLG will advise the Court at the pretrial conference whether it will agree with the Trustee

14  in requesting the Court to decide the issue of unclean hands, as opposed to allowing a jury to

15  determine this issue.

16      Respectfully submitted,

17  DATED:      February 22, 2013              LERCH STURMER LLP

18

19                                          By:___/s/ Jerome N. Lerch_____

20                                              JEROME N. LERCH, ESQ.
                                                DEBRA STEEL STURMER, ESQ.

21                                              Attorneys for Defendant SILICON
                                                VALLEY LAW GROUP

22

23

24

25

26

27

28

Silicon Valley Law Group's Trial Brief; Case No. CV10-04864