UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERARD A MCHALE,<br>Plaintiff,<br>v.<br>SILICON VALLEY LAW GROUP,<br>Defendant. | Case No. 10-cv-04864-JCS<br><br>**MOTION IN LIMINE RE DAMAGES.**<br>**Dkt. Nos. 162, 165** |

## I. INTRODUCTION

In this legal malpractice action, Plaintiff Gerald A. McHale, Jr. P.A., Liquidation Trustee for 1031 Debtors Liquidation Trust ("Trustee") sues Defendant Silicon Valley Law Group ("SVLG") for negligently representing 1031 Advance during its acquisition by Edward Okun, a convicted felon who looted 1031 Advance of its assets in furtherance of a Ponzi scheme. On January 28, 2013, the Court denied SVLG's Motion for Partial Summary Judgment as to the Measure of Damages, rejecting SVLG's theory that would have precluded the Trustee from recovering exchange funds held by 1031 Advance. *See* Dkt. No. 125.

SVLG now seeks to admit evidence proving the amount of lost exchange funds recoverable as damages is limited to approximately $4.5 million, which constitutes the amount of exchange funds Okun stole from 1031 Advance (approximately $23 million) minus the amount of other exchange funds that were later used to close exchanges which were open on the date of sale (approximately $18 million). *See* Dkt. No. 165. The Trustee opposes the admission of such evidence, contending SVLG's damages theory fails to account for the fact the $18 million was obtained through the Ponzi scheme and came with corresponding liabilities. *See* Dkt. No. 162. The Trustee argues that, in the event he prevails on all aspects of the negligence claim, the

maximum amount of exchange funds recoverable as damages should be $31.2 million, which constitutes the stipulated amount of liabilities 1031 Advance owed to its exchangers the date 1031 Advance petitioned for bankruptcy.

The Court held a hearing on this matter on June 28, 2013 at 9:30 a.m. The case is scheduled for trial beginning August 26, 2013. For the reasons stated below, the Court will exclude SVLG from offering evidence that 1031 Advance's damages were reduced by the amount of money used to close the exchanges of the December 19 clients.

## II.     BACKGROUND

### A.     Factual Background[1]

In October 2006, the owners of 1031 Advance became interested in selling their company. Dkt. No. 1 (Complaint) ("Compl.") ¶ 29. They retained lawyers from SVLG to advise them regarding the sale, and ultimately, to perform due diligence for 1031 Advance regarding the sale to 1031 Tax Group LLC, the parent company of the 1031 Debtors of which Okun was the sole shareholder. *Id*. ¶¶ 29-39. The Trustee's malpractice claim against SVLG is based upon the theory that in conducting due diligence for 1031 Advance, SVLG should have discovered that Okun was a thief. *Id*. ¶¶ 43-55.

The sale of 1031 Advance to 1031 Tax Group closed on December 18, 2006, and SVLG's representation of 1031 Advance ended that same day. At the time of the Stock Purchase and Sale Agreement, the Business Enterprise Value of 1031 Advance was $23.2 million plus the value of equity interest in 1031 Advance. Dkt. No. 107 (Joint Statement of Undisputed Facts with Respect to Defendant Silicon Valley Law Group's Motion for Partial Summary Judgment) ("JSUF") ¶ 10.

After purchasing 1031 Advance, Okun looted the exchange funds. JSUF ¶ 12. On December 19, 2006, the day after the sale of 1031 Advance closed, Okun directed transfer of $23,245,850.42 of the exchange funds in 1031 Advance's bank accounts to other entities owned indirectly by Okun. *Id*. ¶ 19. Between April 5, 2007 and May 10, 2007, another $11,663,965.21 of 1031 Advance's exchange funds were taken from 1031 Advance's bank accounts. *Id.*

---

[1] The Court incorporates the background detailed in its previous order denying SVLG's Motion for Partial Summary Judgment as to the Measure of Damages. *See* Dkt. No. 125.

Funds that 1031 Advance received from exchangers who became clients of 1031 Advance after December 19, 2006 (the day after the sale of 1031 Advance), and from exchanger clients of other 1031 Debtors, were used to close transactions for 1031 Advance exchangers with open exchanges on December 19, 2006 (the "December 19 clients"). JSUF ¶ 16. SVLG contends that evidence at trial will establish that the amount of funds used to close the exchanges of the December 19 clients is approximately $18 million. *See* SVLG Br. at 2. The parties have stipulated that 1031 Advance did not have sufficient assets remaining to meet the obligations of the subsequent 1031 Advance exchangers or the other 1031 Debtors and their clients, and that "1031 Advance had liabilities to repay those funds." JSUF ¶ 16.

On May 10, 2007, 1031 Advance filed for Chapter 11 bankruptcy along with the other 1031 Debtors. JSUF ¶ 17. As of the date of bankruptcy filing, $31,229,228 was the deficit in funds that 1031 Advance needed to close exchanges for its exchanger clients. *Id*. ¶ 20.

### B. SVLG's Damages Theory

SVLG contends that the amount of exchange funds 1031 Advance may recover as damages is limited to approximately $4.5 million. SVLG derives this figure by subtracting the amount of money used to close exchanges of the December 19 clients (approximately $18 million) from the amount of exchange liabilities that existed on the date to stock purchase closed (approximately $23.2 million). SVLG contends that the $18 million used to close the exchanges of the December 19 clients resulted in "no liability" to 1031 Advance. SVLG Br. at 2: 17. Thus, SVLG argues that as a result of these exchanges, "1031 Advance's liability for all but approximately $4.5 million in exchanges were *extinguished*." *Id*. at 2:13-14. SVLG contends that the beyond this $4.5 million, "the trustee has not established any actual loss that is compensable as legal malpractice damages with respect to the $18 million that represents successfully closed exchanges." *Id*. at 4:1-2. SVLG also notes that no claim for equitable subrogation by the other 1031 Debtors has been made against SVLG.

In the alternative to limiting damages to $4.5 million, SVLG contends that proximate cause must be determined separately as to the two major categories of exchange funds transferred out of 1031 Advance's account. SVLG Br. at 5-7. The first category is the $23 million transferred out

of 1031 Advance's bank accounts immediately after the sale closed in December 2006. The second category is the $11 million transferred out of 1031 Advance's bank accounts in April to May of 2007. SVLG argues that "ample opportunities were afforded to 1031 Advance management after the sale closed, and before the $11 million was transferred in April-May 2007 time frame, for corporate action to be undertaken to stop Okun's looting of exchange funds." *Id*. at 7:17-19.

Finally, SVLG argues that public policy considerations require limiting the amount of exchange funds the Trustee may recover from SVLG in this legal malpractice action.

### C. Trustee's Damages Theory

The Trustee contends that there is no principled reason to limit damages to $4.5 million as a result of the $18 million cash inflows used to close the exchanges of the December 19 clients because the $18 million was not "free money," but rather money taken from new clients of 1031 Advance, other 1031 Debtors, and clients of other 1031 Debtors, and that 1031 Advance remained liable to repay those funds. Trustee Br. at 3-5; *see also* JSUF ¶ 16. In any event, the Trustee notes that it is undisputed that at the time 1031 Advance filed for bankruptcy, 1031 Advance had owed $31.2 million in exchange funds to its *own exchanger clients*, and that any money owed to other 1031 Debtors and their clients is in addition to this amount. *See* JSUF ¶ 20.

The Trustee contends that the proper measure of exchange funds recoverable as damages is the amount necessary to make it whole before the alleged malpractice took place. Thus, in stark contrast to SVLG's damages theory, the Trustee contends that the proper measure of damages—assuming the Trustee prevails on his malpractice claim—is the total amount of the looted funds ($34,909,815.63), or, at a minimum, $31,229,228, the deficit in funds that 1031 Advance needed to close exchanges on the date 1031 Advance filed for bankruptcy. *See* JSUF ¶ 20.

### III. DISCUSSION

#### A. Whether Damages should be Limited to $4.5 Million

SVLG's theory limiting damages to $4.5 million is without merit. First, SVLG's contention that 1031 Advance is not liable to repay the $18 million used to close the exchanges of the December 19 clients is contradicted by SVLG's own stipulations in the Joint Statement of

United States District Court
Northern District of California

4

Undisputed Facts. *See* JSUF ¶ 16 ("1031 Advance had liabilities to repay those funds."). Moreover, whether the $18 million was taken from new clients of 1031 Advance, other 1031 Debtors, or clients of other 1031 Debtors is irrelevant because regardless of where the money came from, "1031 Advance had liabilities to repay those funds." JSUF ¶ 16. In any event, the Trustee does not seek to recover money owed to the other 1031 Debtors or their clients; at the time 1031 Advance filed for bankruptcy, it had a deficit of approximately $31.2 million in exchange funds that it needed to close exchanges for its *own clients*. *See* JSUF ¶ 20. Thus, SVLG's remark that no claim for equitable subrogation has been made against SVLG by the other 1031 Debtors is simply a red herring.

SVLG's theory is also nonsensical. SVLG seeks to exclude from damages any exchange funds taken from 1031 Advance after December 19, 2006 (on a proximate cause theory), while simultaneously accounting for the cash inflows to 1031 Advance after that date. In other words, SVLG wants the benefit of the Ponzi scheme without the burden. However, the money used to close the exchanges of the December 19 clients did not mitigate the total amount of damages because that money incurred additional liabilities for 1031 Advance. In the Trustee's words, this was not "free money." The parties stipulated to that fact. *See* JSUF ¶ 16.

In its brief, SVLG alludes to the same arguments that have already been rejected by this Court. SVLG cites cases discussing limitations on liabilities owed to *third parties*, but this Court already held that 1031 Advance owned the lost exchange funds and thus seeks to recover damages to compensate the injury suffered by 1031 Advance *itself*. *See* Dkt. No. 125 at 8-9 (citing *Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005); *Official Committee of Unsecured Creditors v. R.F. Lafferty Co., Inc.*, 267 F.3d 340, 349 (3rd Cir. 2001)). This case must therefore be distinguished from *McClarty v. Gudenau*, 176 B.R. 788 (E.D. 1995), where a bankruptcy court held that a Chapter 7 bankruptcy trustee could not, in a legal malpractice suit brought by the trustee against an attorney who had represented the debtor in a pre-petition lawsuit, recover damages on behalf of the debtor which had been extinguished when the debtor filed for bankruptcy. *See id.* at 790 (holding that the debtor suffered no actual damages when her debt was extinguished). Unlike in *McClarty*, 1031 Advance's lost exchange funds do not constitute debt

owed to a third party which was extinguished when 1031 Advance filed for bankruptcy; the lost exchange funds are lost assets of 1031 Advance itself. The Trustee has an obligation to collect all property of the estate, *see* 11 U.S.C. § 704(1), including "all legal and equitable interests of the debtor in property," *see id.* § 541(a)(1). Therefore, the Trustee may recover damages corresponding to the actual injury that SVLG's allegedly negligent conduct inflicted upon 1031 Advance.

In a similar regard, this case must also be distinguished from *Bily v. Arthur Young & Co.*, 3 Cal.4th 310 (1992), where the California Supreme Court held that public policy considerations limited the liability of auditors sued by *third parties*. In this case, the Trustee sues SVLG for its direct dealing with 1031 Advance, not the harm SVLG's alleged negligence caused to third parties. At the time SVLG represented 1031 Advance, SVLG understood the business nature of company performing section 1031 transactions, and that by operation of law and contract, 1031 Advance held legal and equitable interest to millions of dollars in exchange funds. Thus, there is no reason in this case, as there was in *Bily*, to hold as a matter of law that SVLG's potential liability is out of proportion to its alleged negligence, or that any policy consideration in *Bily* holds true in this case.[2]

Accordingly, this Order holds that evidence of the funds used to pay off the debt owed to the December 19 clients came with corresponding, and equal, liabilities. On this basis alone, evidence that such funds were used to pay off the debts of 1031 Advance do not reduce the damages that 1031 Advance had from the looting of its funds. Moreover, where funds are stolen, as they were here, the normal measure of damages is the amount of the funds stolen−and the

---

[2] SVLG's citation to *Ferguson v. Lieff, Cabraser, Heimann & Bernstein*, 30 Cal.4th 1037 (2003), is similarly irrelevant, as *Ferguson* merely holds that several public policy considerations preclude recovery of lost punitive damages in a legal malpractice action. Moreover, not one case cited by SVLG would support holding as a matter of law that Okun's criminal conduct was a superseding cause relieving SVLG of liability. *See* SVLG Br. at 8 (citing *Pacelli v. Kloppenberg*, 65 Ill.App.3d 150 (1978) (holding that attorney had no duty to prevent its client from using a licensed real estate broker from acting as escrowee where escrowee's conversion of funds was unforeseeable); *Dolan Title & Guaranty v. Hartford Acc.*, 395 So.2d 296 (Fla. App. 1981) (attorney's negligence was not the proximate cause of an injury where a fiduciary's misappropriation of funds was not foreseeable); *Griffith v. Taylor*, 12 P.3d 1163 (Alaska 2000) (trial judge did not error in giving the jury a superseding causation instruction)).

existence or nonexistence of corresponding liabilities does not reduce the amount of funds stolen. Accordingly, SVLG may not offer evidence that the debt owed to the December 19 clients was paid.

On the other hand, in California, damages include "all the detriment *proximately caused* [by the defendant's negligence], whether it could have been anticipated or not." Cal. Civ. Code § 3333 (emphasis added). The central issue in this case, to be decided at trial, is whether SVLG was negligent and whether SVLG's conduct proximately caused the looting of 1031 Advance's exchange funds. Plaintiff has offered no principled reason why the Court should hold, as a matter of law, that SVLG's negligence proximately caused any wrongful takings after December 19, 2006. This is a factual question that will be decided by the jury.

## IV. CONCLUSION

For the reasons explained above, SVLG may not offer evidence that 1031 Advance's damages were reduced by the amount of money used to close the exchanges of the December 19 clients. The jury will determine the amount of damages proximately caused by SVLG's conduct.[3]

IT IS SO ORDERED.

Dated: July 18, 2013

JOSEPH C. SPERO
United States Magistrate Judge

---

[3] The Court declines, at this state, to cap damages at the net liabilities owed by 1031 Advance to its exchange clients at the time of bankruptcy. This net figure is not directly relevant to the damages suffered from the theft of 1031 Advance funds−it appears, for example, to exclude any liabilities that 1031 Advance may have owed as of that date to other 1031 Debtors or to their exchanger clients. However, this net amount may have relevance to other aspects of damages. As the parties have not briefed this issue sufficiently, the Court will reserve that issue for trial.